Jerry W. VOLKMAN, et al., Plaintiffs,

v.

UNITED TRANSPORTATION UNION, et al., Defendants.

Civ. A. No. 83–6025–T.

United States District Court,
D. Kansas.

July 24, 1991.

gason, Co–Counsel, San Francisco, Cal., for St. Louis Southwestern Ry. Co., et al.

E.L. Lee Kinch, Ratner, Mattox, Ratner, Barnes & Kinch, Wichita, Kan., and Pamela D. Walker, Little Rock, Ark., for United Transp. Union, et al.

## MEMORANDUM AND ORDER

THEIS, District Judge.

A number of post-trial motions are pending in this case. The court held a status conference on May 2, 1991. Since that hearing, the court has received certain additional submissions from counsel. The court has examined the voluminous briefs filed over the course of the last year and a half and is prepared to rule.

The court notes that it has received a number of "letter briefs" from various counsel of record. Counsel should be aware that, although the court reads the letters it receives, such letters are not pleadings and are not filed in the case file. Any arguments made in such letters are not preserved for purposes of appeal. Any arguments parties wish to have preserved must be included in a pleading filed with the Clerk.

## I. Introduction

Following a lengthy trial to the court in the fall of 1988, the court entered its findings of fact and conclusions of law. *Volkman v. United Transportation Union*, 724 F.Supp. 1282 (D.Kan.1989). The plaintiffs are a class of all persons who worked for the Chicago, Rock Island and Pacific Railroad Company ("Rock Island") as brakemen or switchmen (also called yardmen), who were eligible for employment with the St. Louis Southwestern Railway Company ("SSW") on the Tucumcari Line within the meaning of the Labor Protective Agreement of March 4, 1980, including those who were employed by the SSW. Class Certification Order, Doc. 75. The defendants are Southern Pacific Company, Southern Pacific Transportation Company, SSW, and the United Transportation Union ("UTU").

Lee H. Woodard, David H.M. Gray and Ron D. Beal, Klenda, Mitchell, Austerman & Zuercher, Wichita, Kan., and Bruce H. Stoltze, Brick, Seckingtong, Bowers, Swartz & Gentry, P.C., Des Moines, Iowa, for plaintiffs.

Bennett, Dillon & Callahan, Mark L. Bennett, Jr., Topeka, Kan., and Robert S. Bo-

Following the bankruptcy of the Rock Island, SSW began to operate over and later purchased the Rock Island's Tucumcari Line. The Tucumcari Line begins at a Southern Pacific Transportation line in Santa Rosa, New Mexico, and runs northeast through New Mexico to Dalhart, Texas, Pratt, Kansas, Herington, Kansas, Eldon, Missouri, and east to St. Louis. The Tucumcari Line and the SSW's Corsicana Line began in roughly the same place and end in St. Louis, but the Tucumcari Line is 400 miles shorter than the Corsicana Line. After the purchase of the Tucumcari Line, SSW renamed the two lines. The Corsicana Line was renamed the Pine Bluff Division. The Tucumcari Line was renamed the Kansas City Division. Because the Kansas City to St. Louis segment of the Tucumcari Line was inoperable, the Interstate Commerce Commission granted SSW trackage rights over another railroad's line. The trackage rights went through Jefferson City, Missouri.

The key document involved in this case is the March 4 agreement, Plaintiffs' Exh. 5. This agreement was entered into by all railroads which purchased parts of the Rock Island or the Milwaukee (another bankrupt railroad) and the labor representatives from the crafts employed by the Rock Island and the Milwaukee. The SSW and UTU were parties to this agreement. In general terms, that agreement provided: All employees of the Rock Island who held seniority on the effective date of the agreement (March 4, 1980) in a craft represented by one of the signatory labor organizations were eligible for participation in the hiring procedures of the agreement. Plaintiffs' Exh. 5, March 4 agreement, Art. II, sec. 1. If the SSW had employees on furlough, it could not recall them until after the Rock Island employees on appropriate seniority rosters had exhausted their opportunity to be hired. *Id.* Art. II, sec. 2. SSW was required to give the eligible Rock Island employees in seniority order the first right of hire. SSW was to first utilize existing seniority rosters applicable to the appropriate craft and seniority district for the line involved. *Id.* Art. II, sec. 3. Rock Island employees were to be hired in seniority

order if the number of applicants exceeded the need for additional manpower. *Id.* Art. II, sec. 4. The hiring procedures were to remain in effect for not less than one year from the effective date from the commencement of operations, but in no event beyond April 1, 1984. *Id.* Art. II, sec. 5.

Art. III of the March 4 agreement provided a monthly compensation guarantee (or "protective pay") to all Rock Island employees hired by the SSW and subsequently furloughed. The monthly compensation guarantee was equal to 80% of the Rock Island employee's average monthly straight-time compensation earned during the period June 1, 1977 through May 1, 1979. *Id.* Art. III, sec. 3. Each employee was eligible to receive a monthly compensation guarantee payment for any month in which the employee's monthly compensation guarantee exceeded the employee's actual compensation for that month. *Id.* Art. III, sec. 4. The SSW had no protective pay obligation to Rock Island employees it did not hire. *Id.* Art. III, sec. 1.

Once the SSW selected a seniority system to govern the Rock Island Tucumcari Line, "agreements will be reached ... concerning the manner in which seniority will be allocated in filling additional job assignments, between [SSW's] employees and [Rock Island] employees hired by [SSW]." *Id.* Art. II, sec. 9(a). These agreements are referred to as "implementing agreements."

The UTU's Rock Island labor representatives were excluded by the SSW and UTU from the negotiations of the implementing agreement. The February 23, 1982 implementing agreement reached by the SSW and UTU (without the participation of the Rock Island labor representatives) provided for a number of prior rights positions (an employee holding a prior rights position holds that position until death or dismissal for cause). The total number of prior rights positions were: 43 at Dalhart, 39 at Pratt, 22 at Herington, and 23 at Eldon. Plaintiffs' Exh. 19, February 23 implementing agreement, sec. 2.

The former Rock Island employees hired before the date of the implementing agreement were given a system seniority date of

March 24, 1980, with prior rights in their craft and district. *Id.* sec. 1(a). Rock Island employees hired after the prior rights positions were filled received a system seniority date of the date hired and were placed at the bottom of the SSW seniority roster. *Id.* sec. 4(a).

Under the implementing agreement, the Rock Island employees did not receive preferential hiring for additional positions. SSW would hire for non-prior rights vacancies based on SSW seniority. Furloughed Pine Bluff Division employees could bid for vacancies based on their SSW seniority dates. Former Rock Island employees who had not yet been hired had no SSW seniority and could not bid on vacancies. Furloughed Pine Bluff employees could fill the Tucumcari Line (Kansas City Division) brakemen vacancies as they opened. Thus, SSW would not hire any Rock Island brakemen until all furloughed SSW employees who wanted a position on the Tucumcari Line had taken one.

Only Rock Island yardmen were to be hired by SSW for yard jobs on the Tucumcari Line until April 1, 1984.

Labor representatives had agreed that the Eldon employees should work 23 jobs when the SSW connected from Kansas City to St. Louis. The SSW never intended to use the Tucumcari Line between Kansas City and St. Louis because of its poor condition. The Interstate Commerce Commission granted SSW trackage rights over Missouri Pacific ("MP") track. The terminal for the MP line was at Jefferson City, Missouri, about 30 miles south of Eldon, Missouri (the Tucumcari Line terminal). SSW promised the Eldon local chairman on several occasions that the Eldon employees would have prior rights to jobs between Kansas City and St. Louis on the trackage rights. Under the implementing agreement, however, the Eldon employees would not work the positions on the trackage rights obtained by SSW. There were 23 prior rights positions at Eldon, while the line ran through Jefferson City.

An arbitration decision in 1983 granted Pine Bluff Division employees prior rights to all jobs created by traffic over the MP track between Kansas City and St. Louis. Additionally, Rock Island employees were removed from the March 4 agreement hiring provisions for work west of Kansas City of traffic diverted from the Pine Bluff Division. Plaintiffs' Exh. 29B.

The court found that the February 23 implementing agreement violated the March 4 agreement in several particulars. First, the implementing agreement precluded any future hiring of Rock Island brakemen until after the SSW transferred all willing furloughed Pine Bluff employees to the Kansas City Division. The implementing agreement capped the hiring of Rock Island employees at the numbers for permanent/prior rights positions. Second, the court found invalid the prior rights provisions relating to the Eldon, Missouri Rock Island terminal. SSW violated the March 4 agreement by eliminating preferential hiring for Rock Island brakemen at the terminal where Tucumcari Line traffic would travel in Missouri (Jefferson City). Third, SSW violated the March 4 agreement by its transfer of furloughed Pine Bluff Division employees to Pratt in July 1982. The additional manpower needs created by the Tucumcari Line should have been filled by Rock Island brakemen. 724 F.Supp. at 1328–29.

The court found that the February 23 implementing agreement did not violate the rights of the yardmen. SSW would hire yardmen for all non-diverted yard positions on the Kansas City Division. If traffic increased, the parties would determine which line was responsible for the increase and allocate jobs accordingly. 724 F.Supp. at 1329.

The court found that the defendant UTU breached its duty of fair representation by the exclusion of the Rock Island representatives from the implementing agreement negotiations and by misleading the Rock Island representatives about the timing of the negotiating meetings while secretly concluding an implementing agreement. The UTU, acting through Arnett, performed several arbitrary acts. The UTU did not include plaintiffs in the negotiations nor did it ask them whether they wanted to

trade off the preferential hiring provisions. The UTU put the most important provision of the March 4 agreement—the preferential hiring provision for Rock Island employees—on the trading block. The court also found that the UTU acted arbitrarily and in bad faith in handling the number of prior rights positions at the Eldon terminal in the implementing agreement. The UTU failed to secure jobs for Rock Island brakemen over trackage rights the SSW was almost certain to secure. The court also found a breach of the duty of fair representation in UTU's handling of the arbitration referenced above. The UTU's Arnett and SSW's Huntington manufactured the dispute to limit the rights of the Rock Island brakemen. 724 F.Supp. at 1329-33.

The portion of the plaintiff class that received relief was relatively small. The yardmen received no relief. All Tucumcari Line yard jobs went to the Rock Island yardmen. The off-line employees (employees of Rock Island who did not work on the Tucumcari Line) were entitled to no relief under the March 4 agreement. Only the Tucumcari Line brakemen received any relief. 724 F.Supp. at 1333-36. The court found the defendants jointly and severally liable for plaintiffs' damages in the hybrid breach of contract/breach of duty of fair representation action. 724 F.Supp. at 1336-37.

For a more detailed discussion of the relevant facts in this matter, see 724 F.Supp. at 1284-1317.

## II. Motion of Pre–1983 Hires for New Trial, or to Alter or Amend Judgment (Doc. 215)

■ This motion is filed by plaintiffs Volkman, Cohan, Wade, Blackburn and all other plaintiff class members similarly situated or whose prior rights locations under the court's order are at terminals other than their terminal of choice or are at terminals other than where they were working as of September 14, 1989. This group is also referred to as the pre–1983 hires.

The pre–1983 hires seek either of the following: (1) to permit any Rock Island trainmen with prior rights under the court's ruling to transfer or move their prior rights location to their desired location/terminal; or (2) to permit all Rock Island trainmen with prior rights under the court's ruling to have their prior rights at the location/terminal at which they are presently working.

According to these plaintiffs, under the court's ruling, at least 29 (and possibly as many as 33) Rock Island trainmen will have to move from their present locations and relocate to another terminal where their prior rights locations exist. The movement of these plaintiffs will displace an equal number of Pine Bluff employees. According to these plaintiffs, a poll shows that if the court would allow them to choose their prior rights location, only 8 would move from their present locations. If the court would allow them to maintain their prior rights location where they are presently working, no relocation would be necessary for anyone.

Another group of plaintiffs, the 1983 hires, point out a potential conflict of interest between the pre–1983 hires because the court's order in many circumstances would give 1983 hires prior rights, and thus more job security than the pre–1983 hires, at locations where the pre–1983 hires are presently working and would prefer to remain. The 1983 hires have unanimously agreed that the Rock Island seniority date should govern the relative seniority order of Rock Island employees even in the event the court grants the motion of the pre–1983 hires to provide prior rights at another location. The 1983 hires do not object to the motion of the pre–1983 hires. Doc. 239.

The defendant railroads have filed an opposition. Doc. 242. The railroads argue that the court correctly concluded that neither the March 4 agreement nor any other agreement required carryover seniority or prior rights at any specific terminal. The court rejected plaintiffs' arguments that they had a right to work in a particular location.

The 1983 hires advise the court in a reply brief (Doc. 247) that no real conflict of

interest exists. The 1983 hires have been polled and agree with the position of the pre–1983 hires. All the 1983 hires, even those who would be adversely affected, believe the motion of the pre–1983 hires to move their prior rights should be granted.

The UTU has filed a response, Doc. 253. UTU argues that the pre–1983 hires' allegation—that if the court does not give them prior rights where they desire, that all 33 of them will be required to relocate—is erroneous. The UTU argues that the court's order leaves the pre–1983 hires at status quo; it does not force them to move. What the UTU fails to acknowledge is that prior rights positions are meaningless unless the plaintiffs take advantage of them—i.e., move to where their prior rights positions are located. Otherwise, the plaintiffs will not have the relief in the form of job security that the court intended.

The court previously ruled that, first, all Rock Island employees would maintain their original SSW terminal. If prior to 1983 they received prior rights at an SSW terminal, they will continue to have prior rights at that terminal. If hired in 1983, their SSW terminal is where they were hired in July 1983. Second, plaintiffs would not receive carryover seniority. Their SSW seniority date governs each plaintiff's ability to transfer over the Kansas City Division. Third, all brakemen would receive prior rights at their SSW terminals. The pre–1983 hires maintain their prior rights positions. The 1983 hires were awarded prior rights at their SSW terminal. 724 F.Supp. at 1335.

The court also stated that the first principle—that all Rock Island employees would maintain their original SSW terminal—stemmed from the court's desire not to start a mass shuffling of SSW employees from one end of the Tucumcari Line to the other and that workplace harmony would best be preserved "by leaving employees at their current locations." *Id.* Many of the Rock Island trainmen apparently have been working at terminals other than their prior rights terminals.

The court has considered the arguments presented and must deny the motion to alter or amend. The plaintiffs who moved from their prior rights locations to other terminals on the line apparently did so of their own choice. These plaintiffs voluntarily chose to move from their original SSW terminals and return to their former Tucumcari Line terminals or perhaps to other terminals on the line. The court will not allow the plaintiffs to take advantage of the voluntary movement that has occurred over the years. In effect, the court would be allowing the plaintiffs to choose their prior rights locations. The court has previously ruled that the plaintiffs did not have the right to work in any particular location. The March 4 agreement did not give plaintiffs the right to work in any particular location.

If the parties are able to agree among themselves, the court would have no objection to the transferring of any prior rights locations. Alternatively, if the plaintiffs agree among themselves on the transferring of prior rights locations among themselves and if no harm would be done to the Pine Bluff employees by such transfers, the court likewise would have no objections. The motion for new trial or to alter or amend shall be denied.

### III. Motion to Alter or Amend (Doc. 216)

The motion raises for procedural purposes only (i.e., apparently just to preserve the issue for appeal since the issues are not addressed in the brief) the following issues: (1) whether the yardmen are covered by the March 4 agreement for purposes of brakemen's jobs and whether they should have been required to wait until April 1, 1984 to bid on brakemen's jobs; (2) whether the off-line brakemen are covered by the March 4 agreement; (3) whether the statute of limitations has run on the claim of the Kelso group which arose because of the hiring of certain off-line brakemen in Amarillo; and (4) the appropriate location of prior rights positions and the proper seniority order of those positions. The second issue has been presented by separate motion filed on behalf of the off-line plaintiffs. *See infra* section III. The fourth issue has been presented by separate mo-

tion of the Volkman group of 1982 hires. *See supra* section I.

With respect to the first and third issues presented by this motion, the court believes that its previous opinion and order was correct. *See* 724 F.Supp. at 1318 (Kelso group), 1322–25 (yardmen). The motion to alter or amend shall be denied as it relates to these issues. The second and fourth issues listed above are addressed separately in this opinion.

The following issues are raised and discussed in the plaintiffs' brief, Doc. 217.

### A. Those who refused jobs in July 1983, those to whom no job offers were made, and those who failed physical exams

The issue presented to the court is whether those class members who turned down jobs that were offered in Pratt or Dalhart in the summer of 1983, those who were never offered jobs, and those who accepted jobs but failed physical exams are entitled to some relief. In July 1983, the SSW needed to hire trainmen at Pratt and Dalhart. The Tucumcari Line brakemen who did not accept SSW job offers when they were first extended to them in July 1983 were not granted relief under the court's order. The court's order also did not provide relief for former Rock Island Tucumcari Line brakemen to whom no job offers were made or who failed pre-employment physicals. Only brakemen who accepted employment in 1983 were found to be entitled to relief.

With one exception, the court did not discuss relief for any of the brakemen who declined the SSW's job offer. The exception was Howard Howser. The court described him as the only plaintiff who turned down jobs with the SSW in 1982 and 1983. The court found that Howser was not interested in working for the railroad and that he wanted to remain in Eldon. Plaintiffs argue that the same is not true as to the balance of the Tucumcari Line brakemen who rejected jobs in 1983. The other plaintiffs argue that they would have accepted employment in Pratt or Dalhart if it had been offered in July 1983 with the

security provided by the March 4 agreement. Plaintiffs have submitted a number of affidavits in which they state that they would have taken the jobs had they been offered under the March 4 agreement.

At trial, William L. Reavis testified regarding his efforts to phone Eldon and Herington men who had not been hired and their responses to the job offers. Reavis testified as to approximately 30 of the former Rock Island men who were called. Some plaintiffs had obtained other employment, others were disabled or deceased, others had already returned to work for SSW, others accepted the job offered by the SSW, and others did not wish to relocate. Tr. Vol. XIX at 15–27; 34–36. Plaintiffs stipulated that similar attempts were made to contact all the other individuals on the list of Eldon and Herington men. Some of those individuals indicated that they were not interested in the job because of the location, and some were not interested in the job because of other employment. The efforts made to contact all these people were reasonable. Tr. Vol. XIX at 33–34.

Plaintiffs argue that plaintiff Craig Jones testified that he refused the SSW's offer of employment as a new hire in July 1983 but that he would have accepted such a job offer if it had afforded the protections of the March 4 agreement. It appears that the court did overlook the testimony of this one plaintiff.

Craig Jones' testimony (Tr. Vol. XIII, Doc. 160) reflects the following: Jones was called in mid summer 1983 about employment with SSW. He was told he would be considered a new hire. Tr. Vol. XIII at 40. Jones thought he was offered a job in Pratt. *Id.* at 42. About 40 Pine Bluff people had been transferred to Pratt, plus some former Rock Island Herington employees with later seniority dates than Jones had already been hired. *Id.* Approximately 5 to 10 Herington men with less seniority had been hired. *Id.* at 43.

Jones decided to stay with his job on the OKT Railroad because he felt he would be laid off from SSW. Jones would have 45 to 50 people ahead of him in seniority. Jones

suspected that the work probably was seasonal work for the grain harvest. He felt he would only work for a month or two before being laid off. *Id.*

Even if he had taken the job as a new hire, Jones felt he would never have been able to work his way up through the seniority roster to get a good job with SSW. He would probably have started with an extra board job. The people ahead of him would move up the seniority ladder as he did and he would always remain below them in seniority. Most of the former Herington men were younger than Jones, so Jones would retire first after spending the rest of his working life behind the Herington men. The other men would fill the pool turn jobs. Jones felt there was a good chance that he would never get off the extra board. *Id.* at 43–44.

Jones explained how the lowest seniority man on the extra board would get bumped in the event of a decline in business. When business on the SSW would decline, a pool turn would be cut. The employees in the cut pool turn would use their seniority to bump other employees from their pool turn positions. The bumping would continue until the least senior man on the extra board would be furloughed. *Id.* at 44–45.

Under the March 4 agreement, the Rock Island men hired by SSW were to be hired in order of their Rock Island seniority. Jones knew his approximate place on the Rock Island seniority roster. *Id.* at 46. If Jones were offered a job in the appropriate Rock Island seniority order, he would have taken it, in Herington, Pratt or Dalhart. *Id.* at 46–47. He would have taken a job anywhere on the line. *Id.* at 48.

Jones conceded on cross that the fact that the OKT job would have allowed him to remain in Herington probably had something to do with his taking the OKT job. Jones further testified that, with so many people around the SSW, the OKT looked like a better place to make money. *Id.* at 68. On redirect, Jones testified that he chose not to take the SSW job because of the fact that he would be the lowest one in seniority and because there were Pine Bluff men ahead of him. *Id.* at 86–87.

After re-examining this testimony, the court concludes that plaintiffs have shown by a preponderance of the evidence that Craig Jones would have accepted a job had one been offered which conformed to the requirements of the March 4 agreement, i.e., had he been hired in the appropriate Rock Island seniority order before the less senior Rock Island men, and before furloughed Pine Bluff employees were recalled. Jones is entitled to the same relief as the 1983 hires.

■ The court believes that, with the exception of plaintiff Craig Jones, those plaintiffs who refused job offers are not entitled to relief. Plaintiffs were given a full opportunity at trial to submit evidence regarding Rock Island brakemen's motives for rejecting SSW's offers of employment and evidence showing which Tucumcari Line brakemen never received offers. Plaintiffs should have presented their best case at trial. The plaintiffs' stipulation and their failure to present evidence from any of the other class members who refused jobs in 1983 precludes those plaintiffs from recovering.

■ The Rock Island employees who were not contacted in July 1983 are not entitled to relief. Plaintiffs stipulated that SSW made a good faith effort to locate all unemployed Herington and Eldon brakemen. Plaintiffs' stipulation that the SSW made a good faith attempt to contact all the former Rock Island employees eliminates any claims on the part of those who were not contacted. The court is aware of no evidence in the record that had these individuals been contacted, they would have accepted the position that was being offered.

■ The Rock Island individuals who were rejected by SSW because they failed physical exams are not entitled to relief. Under the March 4 agreement, "applicants will be required to meet those physical and rules standards which the carrier applies to its own employees on reexamination." Plaintiffs' Exh. 5, March 4 agreement, Art. II, sec. 4. Rock Island employees who were in service with the Rock Island at the

time of interim operation or purchase and who were hired on the commencement of operations by SSW pursuant to the March 4 agreement were presumed qualified physically. *Id.* Art. II, sec. 4. SSW had the burden of proof if it wished to challenge such qualifications. *Id.* Only by requiring physical examinations could SSW meet its burden to challenge the physical qualifications of any plaintiff. At the hiring stage, it was SSW's burden to show that the plaintiffs were not physically qualified for the job. Once this case reached trial, however, the plaintiffs bore the burden of proof to show that they were qualified for the jobs they sought. The plaintiffs who failed physical examinations had the opportunity to present evidence at trial that they were qualified physically. Their failure to do so precludes them from recovery.

■ Those plaintiffs who did not appear at trial to make their claims have waived them. This includes those who were called and turned down job offers. Plaintiffs had the opportunity to present their reasons for turning down the jobs that were offered. Except for plaintiff Craig Jones, the motion to alter or amend shall be denied on this issue.

### B. Eldon/Jefferson City jobs

Plaintiffs request that the 23 prior rights positions originally designated for Eldon be deemed to be prior rights positions at Jefferson City.

A total of 23 prior rights jobs were assigned to the Eldon terminal. The labor representatives originally agreed that the Eldon men should work 23 jobs when SSW connected the line from Kansas City to St. Louis regardless of how SSW reached St. Louis. *See* 724 F.Supp. at 1305. The court previously found that to allow SSW to avoid its obligation to hire Rock Island employees by the substitution of trackage rights would violate the provisions of the March 4 agreement requiring SSW to hire

Rock Island employees from the appropriate rosters on the line. The court ruled that the additional manpower requirements for non-diverted[1] traffic at Jefferson City on the MP track resulted from the purchase of the Tucumcari Line. *Id.* at 1327.

Plaintiffs note that the court held that SSW violated the March 4 agreement by eliminating preferential hiring for Rock Island brakemen at the terminal where Tucumcari Line traffic would travel in Missouri. *See* 724 F.Supp. at 1329. Plaintiffs argue that the court has previously found that the former Rock Island Tucumcari Line brakemen should have been preferentially hired for the brakemen's jobs at Jefferson City which were due to nondiverted traffic. Absent an order by the court, no former Rock Island employee will ever hold a prior rights job at Jefferson City. Plaintiffs request that the court modify its opinion so that the few men who hold prior rights jobs at Eldon are allowed to transfer to Jefferson City.

The railroads argue that the court made it clear in its opinion that the March 4 agreement did not require prior rights at a particular terminal.

UTU argues that if Eldon is not a Tucumcari Line terminal, the employees at Eldon are off-line employees and have no rights to preferential hiring. The UTU's position is simply incorrect. Eldon was on the Tucumcari Line. Jefferson City was the substitute for Eldon on the Tucumcari Line and became the new Tucumcari Line terminal.

■ The court agrees with plaintiffs that the 23 prior rights positions originally designated for Eldon should be deemed prior rights positions at Jefferson City. Unless the court amends its findings on this issue, the wrong that the court recognized—that the Eldon men should work the jobs once the line went through and the SSW's subsequent failure to employ those men in prior rights jobs at Jefferson City—would go

---

1. Diverted traffic is rail traffic that has been transferred from one line to another. In this case, SSW diverted traffic from the longer Corsicana Line (Pine Bluff Division) to the shorter Tucumcari Line (Kansas City Division). *See*

724 F.Supp. at 1315. The general practice in the railroad industry is that when trains are diverted, the workers on the original line follow their work to the new line. *Id.* at 1312.

without a remedy. This problem results from an apparent oversight in the court's opinion. The current prior rights holders in Eldon are entitled to transfer their prior rights positions to Jefferson City. Additional prior rights positions, up to a total of 23, shall be made available under the provisions of the March 4 agreement to eligible former Rock Island brakemen.

The following former Rock Island brakemen shall be eligible for prior rights positions (up to a total of 23) at Jefferson City. First, the current prior rights brakemen at Eldon shall be allowed to transfer their prior rights positions to Jefferson City. Apparently, either three or four prior rights employees are working at Eldon. These brakemen shall be granted back pay in the event their wages from working the Eldon local were less than the wages of the three or four most senior brakemen in Jefferson City. The second group of former Rock Island brakemen eligible for prior rights positions is defined as follows: any former Rock Island Eldon brakemen who have gone to work for the SSW but who have not obtained prior rights positions elsewhere on the Tucumcari Line shall be eligible for a prior rights position at Jefferson City. The identities of any such plaintiffs, if any, could be established at a hearing. These plaintiffs shall not be granted back pay. Former Eldon brakemen who have obtained prior rights positions at Pratt or Dalhart shall not be entitled to the prior rights jobs in Jefferson City. Also excluded from this category are those to whom no job offers were made, those who declined job offers, and those who failed physical examinations after accepting job offers. Those former Eldon brakemen who declined job offers for Pratt or Dalhart in 1983, who did not receive job offers, and who failed physical examinations are not entitled to relief under the court's ruling in section III(A) above.

The court is mindful of its previous statement that plaintiffs do not have the right to work at the terminal of their choosing. The situation with Eldon is different from the situations at the other terminals. The Rock Island track through Missouri was in such poor shape that no one ever expected the SSW to use it. All parties expected SSW to operate over trackage rights and to hire the Eldon men at the terminal on the MP track. The court addressed Eldon separately at several points in the opinion. *See* 724 F.Supp. at 1303–05, 1310–11. The court believes it appropriate to treat Eldon in a different manner.

### C. Lost Pension Benefits

■ There appears to be no dispute that lost pension benefits are an appropriate component of the damage award. The damage award shall therefore include lost pension benefits. The only dispute centers around the computation of the lost pension benefits.

Plaintiffs propose a method of calculating lost retirement benefits involving determining the difference between current probable benefits and the benefits plaintiffs would have obtained at the higher wages they should have received. This amount can be multiplied by life expectancy and reduced to present value, and presumably paid to plaintiffs immediately.

Defendant railroads respond that because railroad retirement benefits are funded by employer-employee contributions, SSW will be required to deduct railroad retirement taxes from any judgment. Deducting railroad retirement taxes and remitting those taxes to the appropriate entity will result in the proper credit for railroad retirement benefits. Under the railroads' plan, the plaintiffs would not receive an award for lost pension benefits now, but the retirement benefits they ultimately receive will be increased due to the earnings attributed to them from the back pay award.

Plaintiffs argue that under 45 U.S.C. § 231(h)(2) and 20 C.F.R. § 211.3, backpay awards are subject to deductions for retirement contributions when they are paid for an identifiable period of absence due to personal injury or when they are paid for a certain period of time resulting from the employee's displacement to a less remunerative position.

Section 231(h)(2), 45 U.S.C., provides in pertinent part:

> An employee shall be deemed to be paid "for time lost" the amount he is paid by an employer with respect to an identifiable period of absence from the active service of the employer, including absence on account of personal injury, and the amount he is paid by the employer for loss of earnings resulting from his displacement to a less remunerative position or occupation.

This section follows the definition of the term "compensation," which means any form of money remuneration for services rendered, including remuneration paid for time lost as an employee (which shall be deemed earned in the month in which such time is lost). 45 U.S.C. § 231(h)(1).

Under the regulations, a payment made to the employee for a period during which the employee was absent from active service is considered to be pay for time lost and is, therefore, creditable compensation. 20 C.F.R. 211.3.

Pay for time lost as an employee includes:

> (1) Pay received for a certain period of time due to personal injury, or
>
> (2) Pay received for loss of earnings for a certain period of time, resulting from the employee being placed in a position or occupation paying less money.

20 C.F.R. 211.3.

Plaintiffs argue that they were never displaced by the SSW from one position to another less remunerative position. They could not have been displaced to a less remunerative position, since they were at the bottom of the seniority roster from the moment they were hired. In the period from January 1983 and the date they went back to work, they were not displaced. Plaintiffs state that individual backpay awards do not constitute compensation for purposes of determining benefits unless they are subject to deduction for railroad retirement tax and an employer's matching contribution. Plaintiffs state that backpay awards are not subject to such a deduction.

The statute and the regulations speak of pay for time lost including (and these provisions do not say "limited to") absences due to injury or being in a lower paying job. The plaintiffs come within these provisions of the statute and regulations. They were either absent (not hired when they should have been) or when hired, they were placed at the bottom of the roster and therefore earning less money because of the inability to bid on jobs. The damage award is therefore pay for time lost, subject to the normal deductions of railroad retirement taxes as with any other award of pay for time lost.

### D. Prejudgment interest

█ Plaintiffs request prejudgment interest on the damage award. Defendant railroads argue that the court properly exercised its discretion to deny prejudgment interest. In reply, plaintiff acknowledge that granting prejudgment interest on an award of backpay can be discretionary.

Both sides agree that the award of prejudgment interest is discretionary. The court chooses to exercise its discretion in favor of allowing prejudgment interest.

### E. Pool Caboose Allowance

█ The court's order awards the pool caboose allowance to the 1983 hires for all trips taken with the SSW over the previous six years. See 724 F.Supp. at 1336. The court has ruled that these plaintiffs should have been hired for jobs that would have allowed them to work more. Just as their actual wages differ from the wages they should have received, the amount of the pool caboose allowance was reduced. Plaintiffs request that this allowance be calculated on the basis of the trips they should have taken had they been properly hired.

Defendant railroads argue that these plaintiffs will actually receive a caboose allowance when they are paid the difference between what they earned and what they would have received had they had prior rights. If the lost back pay award already includes the pool caboose allowance, granting an additionally caboose allowance will result in a double recovery.

The court agrees with the positions of both sides on this issue. The railroads have apparently conceded that the pool caboose allowance is appropriately included as a part of the back pay award. However, to the extent the pool caboose allowance is factored into the backpay calculations, it shall not be allowed as a separate category of damages.

### F. Conclusion

The motion to alter or amend (1) shall be denied as to the claims of the yardmen; (2) shall be denied as to the claims of the Kelso group; (3) shall be granted as to plaintiff Craig Jones, but shall be denied as to all others who declined 1983 job offers, who did not receive job offers in 1983, and who failed physical examinations after accepting 1983 job offers; (4) shall be granted as to the Eldon/Jefferson City prior rights positions; (5) shall be granted in part and denied in part as to lost pension benefits; (6) shall be granted as to prejudgment interest; and (7) shall be granted in part and denied in part as to pool caboose allowance.

IV. Motion of Off–Line Plaintiffs to reconsider, reopen the record for additional evidence, amend or grant a new trial (Doc. 248)

Eight so-called off-line plaintiffs (L.D. Ward, Joseph F. Edwards, Richard L. Humble, Phillip D. Brunow, Franklin A. Callaway, Kenneth W. Brown, R.L. Moore and L.D. Molloy) have filed a motion to reconsider, reopen the record for additional evidence, amend the court's findings, or for a new trial. The plaintiffs request the court to grant them the same protection as the court granted to the July 1983 hires, i.e., greater seniority, prior rights, and damages. These plaintiffs, while employed by the Rock Island, were not employed on the Tucumcari Line.

Under the March 4 agreement, the SSW was required to "first utilize existing seniority rosters applicable to the appropriate craft and seniority district *for the lines* and territories involved in fulfilling employ-

ment needs in connection therewith." Plaintiffs' Exh. 5, March 4 agreement, Art. II, sec. 3 (emphasis added). The court interpreted the March 4 agreement to require that SSW first hire from the seniority roster at the location where the additional employees were needed (e.g., Dalhart) and then from the other seniority rosters on the line (e.g., a dovetailed roster from Pratt, Herington, and Eldon) in that craft. *See* 724 F.Supp. at 1297, 1322–23. The March 4 agreement did not require SSW to hire off-line Rock Island employees for Tucumcari Line positions. These off-line Rock Island employees as well as other Rock Island employees not hired were to receive certain benefits under the Rock Island Railroad Transition and Employee Assistance Act, Pub.L. No. 96–254, 94 Stat. 399 (May 30, 1980), 45 U.S.C. §§ 1001–1018. *See* 724 F.Supp. at 1295–96.

 The court previously ruled that the off-line plaintiffs were entitled to no relief. 724 F.Supp. at 1333. The court is not inclined to reconsider this matter. While these plaintiffs fit within the broad definition of eligibility for hiring, *see* March 4 agreement, Art. I, sec. 1(d) & Art. II, sec. 1, SSW was not required to hire them preferentially under Art. II, sec. 3. The motion to reconsider, reopen, amend, or grant a new trial shall be denied.

### V. Damage Calculations

The plaintiffs have submitted their initial damage calculations to the court. Based on the court's rulings on the motions to alter and amend, as well as the court's ruling on the contested damage issues, the plaintiffs will need to recalculate their damages. Upon the filing of the new damage computations, the defendants shall have the opportunity to respond. There are two categories of plaintiffs who shall receive damage relief, the 1983 hires who should have been hired earlier and a group who should have been hired in Pratt in July 1982 instead of the Pine Bluff Division employees who were hired. Additionally, as the court has ruled in this opinion, the current Eldon prior rights brakemen are entitled to an award of damages if their

earnings were less than the earnings of the most senior Jefferson City brakemen.

The UTU has requested that hearings be held on the facts at issue in the back pay calculations. Defendant requests the right to cross-examine each claimant. The court intends to refer the matter to the magistrate to conduct the necessary hearings. Individual issues as to the plaintiffs would include the amount of any interim earnings or unemployment compensation, the amount of their SSW wage guarantee amount (i.e., the protective pay, which is based on Rock Island earnings), and any individual issues regarding mitigation of damages. The parties would need to present the wage data from the SSW employees being used as the comparison for the back wage award, if this evidence is not in the record. In previous cases of this nature the court has held that interim earnings shall be determined from federal income tax returns and W–2 forms. *See Aguinaga v. United Food and Commercial Workers Intern. Union AFL–CIO/ CLC*, No. 83–1858 (D.Kan. Apr. 16, 1990) (1990 WL 66024, 1990 U.S.Dist. LEXIS 5824). The court did not allow individual cross examination of the over 600 plaintiffs in *Aguinaga. Id.; Aguinaga v. John Morrell & Co.*, 720 F.Supp. 862 (D.Kan.1989). The court is not convinced that individual inquiry is necessary in the present case.

The following damage issues are presented to the court for decision: (1) how the average wages for the 1983 hires are to be determined for the purpose of calculating their damages; (2) whether the earnings of the off-line Rock Island men hired by SSW at Pratt should be imputed to the July 1983 hires in mitigation of their damage claims; (3) the calculation of back wage damages arising from the jobs held by Pine Bluff men in July 1982; (4) the rights of E.C. Nuss, D.B. Hill, and S.L. Gonzolas to recover relief; and (5) the right of R.D. Parker to recover monetary relief. *See* Doc. 327. Nuss, Hill, Gonzolas and Parker are 1983 hires.

### A. 1983 Hires

■ It is not entirely clear from the submissions exactly how many plaintiffs are entitled to damages at which locations (Pratt and Dalhart). Plaintiffs have calculated damages for ten (10) employees at Dalhart and fifteen (15) at Pratt. Defendants' submissions make some references to eleven (11) at Dalhart and fourteen (14) at Pratt. The court is unaware of the reason for this disparity, but believes that this matter should be easily resolvable. The court shall use the names and locations provided by plaintiffs in their submissions (Doc. 305) in the absence of some showing by the defendants that there is a plaintiff misplaced in the Pratt category who should be in the Dalhart category.[2] As noted above, plaintiff Craig Jones is entitled to relief. He testified that he thought he was offered a position in Pratt. Jones shall be the sixteenth person entitled to relief at Pratt.

SSW should have hired this group in December 1982 or January 1983 instead of July 1983. The group is to get "an *average* wage for the period between their new date of hire and the date actually hired in the summer of 1983." 724 F.Supp. at 1336 (emphasis added). The 1983 hires are also entitled to back pay for the difference between the salaries they should have received as prior rights employees and the

---

**2.** Specifically, the UTU has calculated damages for the following thirteen plaintiffs at Pratt: L.B. Bettles, W.J. Megenity, J.D. Spaulding, D.G. Woolley, B.A. Beeton, N.D. Benhardt, L.D. Bettles, W.E. Donahue, G.D. Kickhaefer, R.D. Ludden, E.C. Nuss, D.B. Hill, and R.D. Parker. Doc. 322, Exh. 8. Plaintiffs have calculated damages for these thirteen as well as F.S. Carson and M.R. Lynn. Doc. 305. The UTU's calculations do not appear to include Carson at all. The UTU includes Lynn within the Dalhart group.

The UTU has calculated damages for the following eleven plaintiffs at Dalhart: L.E. Scott, R.A. Corona, D.N. Mascareno, S.D. Sams, M.R. Lynn, U. Ruiz, T.R. Mathews, G.R. Vernon, S.L. Gonzolas, J.A. Schlesener, and M.J. Sullivan. As noted above, plaintiffs have included Lynn within the Pratt category and have computed damages for the remaining ten at Dalhart.

The court believes that the location where Lynn was initially hired in 1983 should be easily verifiable and should be stipulated by the parties. If the parties cannot agree on which category Lynn falls within, the parties will need to present evidence on this matter at the hearing before the magistrate.

salaries they did receive until the day of the order. The 1983 hires also receive vacation pay and sick leave based on their Rock Island seniority dates. They are entitled to the pool caboose allowance for all trips taken over the previous six years. *Id.* The court has ruled in this opinion that the pool caboose allowance is to be paid for all trips the plaintiffs should have taken.

The parties are not in agreement as to how this "average" wage should be calculated or even whose average wage is to be used.

Plaintiffs computed separate annual average wages for Dalhart and Pratt. All of the 1983 hires were employed at one of these two terminals. Plaintiffs computed the average wages based upon the Mileage Agreement (Plaintiffs' Exh. 11E, Addendum 29) which plaintiffs assert provides that crews on through freight will work 4,000 miles per month. Plaintiff Volkman testified at trial how back wages could be calculated on this basis. Tr. Vol. XVI (Doc. 164) at 10–14. Plaintiffs assert that this testimony was not challenged by cross-examination nor by any defense witness. Plaintiffs assert that they used the same trip lengths and basic rates that the SSW used in determining wages.

Plaintiffs concede that the Mileage Agreement is a recommendation by the UTU and not an agreement of the parties. Doc. 237 at 4 n. 2. As such, it is not binding on the court for the computation of damages. Further, Volkman's testimony on what he thought was the appropriate method of computing lost wages, even if unchallenged by the defendants, does not bind the court. The court must make the final determination of the back pay to be awarded to compensate plaintiffs for their losses.

For each 1983 hire, it is not disputed that deductions must be made for any unemployment compensation received, any SSW wages received, and any wages earned from other sources.

UTU argues the salaries the 1983 hires should have received should be computed by reference to the Pine Bluff Division employees who transferred to Dalhart and Pratt from June to July 1983 and who came right below the prior rights men on the seniority rosters. UTU proposes that the proper way to calculate the pay differential is to line up the 1983 hires in seniority order (according to the January 1, 1985 seniority roster when they were reordered according to their Rock Island date of hire), line up the Pine Bluff Division 1983 transfers to Pratt and Dalhart in SSW system seniority order, then pair them off and compare wages taking into account availability during the back pay period.

Defendant UTU's method of calculating damages is appealing. The are two general methods of determining the compensation due to a discriminatee. First, the court may award backpay based on the hours the individual worked in the years before the violation. *NLRB v. Laborers' Int'l Union,* 748 F.2d 1001, 1004 (5th Cir. 1984), *cert. denied,* 470 U.S. 1085, 105 S.Ct. 1845, 85 L.Ed.2d 144 (1985). Second, the court may award back pay based on the representative employees method. This method requires averaging the earnings during the backpay period of other employees who were earning the same as the discharged employee at the time of the discharge. *NLRB v. S.E. Nichols of Ohio, Inc.,* 704 F.2d 921, 924 (6th Cir.), *cert. denied,* 464 U.S. 914, 104 S.Ct. 275, 78 L.Ed.2d 256 (1983). A variation of this method requires a comparison between the discriminatee and one representative employee. *NLRB v. Overseas Motors, Inc.,* 818 F.2d 517, 520 (6th Cir.1987). In the present case, the court cannot use the wages of each individual, since the individual was not employed when he should have been. Rather, the court will have to use some representative employee or other averaging method.

The UTU has proposed an alternative method, to average the salaries of the fourteen employees in Pratt and the eleven employees in Dalhart whom the 1983 hires would have replaced on the roster if they had had prior rights. The average absenteeism of the employees whose actual pay is being averaged and the actual work or

lay-off record of the claimant must be compared.

Defendant railroads propose that the proper measure of damages should be based on the actual average earnings of either the top ten (10) or top twenty (20) Pine Bluff men at each location.

■ The defendant railroads also argue that the plaintiffs were required to mitigate their damages. The railroads argue the plaintiffs could have earned at least as much as the off-line plaintiffs who were below them on the seniority roster. The 1983 hires could have exercised their seniority and bumped the off-line plaintiffs in the event of a layoff. Therefore, the earnings of the off-line plaintiffs should be used as a base level requirement for mitigation of damages. If in any year a plaintiff did not earn as much as the average of the off-line men, the average earnings of the off-line men should be used as a setoff. The court finds this mitigation of damages argument to be logical.

■ Plaintiffs argue that the defendants failed to plead mitigation of damages as an affirmative defense. The defendants did not plead mitigation of damages in the Final Pretrial Order, Doc. 86. The court believes, however, that it would be error to allow plaintiffs to recover lost wages without inquiring into mitigation of damages. Plaintiffs are to be compensated for lost wages. They are not to receive a windfall. If plaintiffs could have worked but did not, their recovery should be reduced accordingly. The court believes that the average earnings of the off-line plaintiffs who were below them on the seniority roster should be used as the approximation for the mitigation of damages requirement.

■ Certain class members died, were terminated, or suspended during the period plaintiffs claim entitlement to damages. Plaintiffs have conceded that J.D. Spaulding, R.A. Beeton and S.L. Gonzolas are not eligible for damages during any period of suspension and that N.D. Benhardt is not eligible for damages for the period he was off work due to illness. Plaintiffs also assert that W.J. Megenity's estate is not

seeking damages after the date of his death in 1986. These concessions are appropriate, since the court cannot award lost wages for any period when a plaintiff was unavailable for work.

Plaintiffs do not dispute that R.D. Parker was fired, but they believe he should be allowed a full recovery. He was a July 1983 hire who was fired on April 10, 1984 because he refused to report to work in Jefferson City. Parker was entitled to a prior rights position, apparently at Pratt, pursuant to the court's prior opinion. An evidentiary hearing is necessary to determine whether Parker would have been terminated had he been given a job under the March 4 Agreement.

Defendant railroads argue that class members E.C. Nuss, D.B. Hill and S.L. Gonzolas are not eligible to recover damages since there is no proof that they actually worked for the Rock Island as brakemen. If they did not hold seniority as brakemen, they were not entitled to preferential hiring under the March 4 agreement. Plaintiffs' Exh. 5, March 4 agreement, Art. II, sec. 2. According to plaintiffs, Nuss, Hill and Gonzolas were shown on the applicable Pratt and Eldon seniority rosters. The court believes that this matter should be verifiable.

The court believes that evidentiary hearings are needed on whether Nuss, Hill and Gonzolas were eligible for hire under the March 4 Agreement and whether Parker should be allowed to recover since he was fired for failure to report to work. The court shall refer the hearings to the magistrate.

The court has carefully considered the various back pay proposals. Back pay shall be awarded to the ten (10) 1983 Dalhart hires based on the average of the ten (10) most senior Pine Bluff Division employees working at Dalhart. Back pay shall be awarded to the fifteen (15) 1983 Pratt hires and Jones based on the average of the sixteen (16) most senior Pine Bluff Division employees working at Pratt.

### B. Eight plaintiffs who should have been hired in July 1982

The court previously found SSW transferred eight Pine Bluff men to jobs in Pratt during July 1982 when former Rock Island Tucumcari Line brakemen should have been hired for those positions. The first eight former Rock Island brakemen hired after that time should have gotten those positions. They should receive the wages of the eight Pine Bluff men and protective pay for the intervening period until they were actually hired. 724 F.Supp. at 1336. Eight former Rock Island men were hired in December 1982. Apparently, twelve (not eight) Pine Bluff employees were hired to work on the Tucumcari Line in July 1982.

Plaintiffs's counsel discovered an additional former Rock Island employee who was hired in August 1982 (R.L. Garfield). Plaintiffs argue that Garfield should be treated as if he should have been hired in July 1982. The court agrees that this additional Rock Island man should be included within the group entitled to recover damages. Garfield is entitled to approximately one month's wages, since he should have been hired in July 1982 instead of August 1982.

Plaintiffs have calculated the total wages paid to the former Pine Bluff men who worked on the Tucumcari Line in 1982, then divided by eight to account for the eight men hired in December. The figure was divided by six months. One months' wages were attributed to Garfield and the rest was reallocated to the eight former Rock Island men employed in December. Deductions were then made for wages actually earned by the plaintiffs from SSW or other employers or for unemployment compensation received. The guarantee payments under the March 4 agreement were then added. Plaintiffs estimated the amount of time the claimants would not have been working during 1982 to be 50% because the Pine Bluff men at Pratt made about half as much as the prior rights men.

Defendant railroads argue that the plaintiffs' calculation of damages is incorrect since it adds the wage guarantee to the average earnings of the Pine Bluff men.

Defendant railroads propose the proper measure of damages to be to award the eight 1982 hires the total earnings of the Pine Bluff men in 1982 ($66,416.27). That total should then be divided by 8 and averaged over the months from July through December 1982. If the resulting figure exceeds the monthly guarantee of each plaintiff, there is no guarantee payment. The railroads propose that the plaintiffs be required to produce their earnings records from the Rock Island from 1977 through 1979 so the guarantee amount may be computed. SSW does not have the records of their Rock Island earnings.

In reply, plaintiffs argued that the wages of the twelve Pine Bluff men which are to be paid to the eight over the months that the twelve actually worked (instead of spread out over the remainder of 1982). Assuming the Pine Bluff men were furloughed once the harvest was over, the Rock Island men that should have had those jobs would have received protective pay during the furlough period.

The court has carefully considered the positions of the parties. Each of the nine plaintiffs (the eight hired in December 1982 and Garfield) should receive back pay for the period beginning when the Pine Bluff men were hired. The average earnings of the twelve Pine Bluff employees shall be calculated on a monthly basis. Each plaintiff shall be entitled to an award of back pay in an amount equal to the average earnings of the Pine Bluff men, per month, from the time the Pine Bluff men were hired until the time the plaintiff was hired. If and when the Pine Bluff employees were furloughed, the plaintiffs shall be deemed to have been furloughed at that same time. Wage guarantee payments are due for any month in which the back pay award falls below the amount of any plaintiff's wage guarantee amount. Plaintiffs shall produce their Rock Island wage records from the appropriate time period so that the defendants may verify the computation of the guarantee amount. Any hearings that are necessary on this group of nine plaintiffs shall also be conducted by the magistrate.

### VI. Plaintiffs' Application for Attorney Fees and Expenses

Plaintiffs request total fees in the amount of $836,744.25. Plaintiffs additionally seek an enhancement of 20%, or $135,888.00. Plaintiffs also seek recovery for expenses incurred in the prosecution of this action in the amount of $105,750.49. Plaintiffs' total request is $1,078,379.74. This application is for services rendered through December 31, 1989. Plaintiffs state they will file a supplemental request after all damages have been calculated following the court's ruling on the various motions to alter or amend.

The court shall address certain issues that have been raised, primarily the issue of whether plaintiffs are entitled to an award of attorney fees and expenses, and if so, under which of the several theories plaintiffs have advanced. The court cannot make a specific monetary award until after a hearing.

Each defendant argues that there is no statutory basis for an award of fees against it. In response, plaintiffs have stated that they are not seeking an award of fees under any statute. The court shall therefore turn to the common law basis for an award of fees. Contrary to the arguments of defendants, the plaintiffs previously briefed the court's authority to award attorney fees and expenses in the post-trial submissions. *See* Doc. 204. Both defendants argue that there is no common law basis for an award of fees in the present case.

### A. The American Rule

 Under the American Rule, the prevailing litigant is ordinarily not entitled to collect an attorney's fee from the loser. *Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 247, 95 S.Ct. 1612, 1616, 44 L.Ed.2d 141 (1975). Although the American Rule ordinarily precludes the allowance of attorney's fees in the absence of statutory or contractual authorization, the court may award attorney's fees when the interests of justice so require. *Hall v. Cole,* 412 U.S. 1, 4–5, 93 S.Ct. 1943, 1945–46, 36 L.Ed.2d 702 (1973).

Several exceptions to the American Rule have been recognized. The court may award attorney's fees to a successful party when his opponent has acted "in bad faith, vexatiously, wantonly, or for oppressive reasons." *Id.* at 6, 93 S.Ct. at 1947 (citations omitted). Another exception is found in the common fund case. Attorney fees are traditionally awarded to the successful plaintiff when his action creates a common fund, the benefit of which is shared by all members of a class. *Id.* at 5 n. 7, 93 S.Ct. at 1946 n. 7. Another well-established exception involves cases where the plaintiff's litigation confers "a substantial benefit on the members of an ascertainable class, and where the court's jurisdiction over the subject matter of the suit makes possible an award that will operate to spread the costs proportionately among them." *Id.* at 5, 93 S.Ct. at 1946. (quoting *Mills v. Electric Auto–Lite Co.,* 396 U.S. 375, 393–94, 90 S.Ct. 616, 626, 24 L.Ed.2d 593 (1970)). This exception has its origins in the common fund exception. *Id.* at 5, n. 7, 93 S.Ct. at 1946, n. 7.

### B. Damages in a DFR Case

Plaintiffs argue that attorneys fees are part of the damages recoverable for a union's breach of its duty of fair representation. The UTU argues that attorney fees are not recoverable in the present case because the plaintiffs' claim was not that the UTU failed to process a grievance through arbitration. The court does not find this argument to be particularly persuasive.

Although not an exception to the American Rule, attorney's fees have been awarded in certain labor law cases as an element of the plaintiff's damages. In duty of fair representation (DFR) cases, several courts have held that attorney fees may be awarded as an element of damage in an action against a union for breach of the duty of fair representation. *Ames v. Westinghouse Electric Corp.,* 864 F.2d 289 (3d Cir.1988); *Bagsby v. Lewis Brothers, Inc., of Tennessee,* 820 F.2d 799 (6th Cir.1987); *Zuniga v. United Can Co.,* 812 F.2d 443 (9th Cir.1987); *Dutrisac v. Caterpillar*

*Tractor Co.*, 749 F.2d 1270 (9th Cir.1983); *Stanton v. Delta Air Lines*, 669 F.2d 833 (1st Cir.1982); *Del Casal v. Eastern Airlines, Inc.*, 634 F.2d 295 (5th Cir. Unit B Jan. 1981); *Self v. Drivers, Chauffeurs, Warehousemen and Helpers Local Union No. 61*, 620 F.2d 439 (4th Cir.1980); *Scott v. Local Union 377, International Brotherhood of Teamsters*, 548 F.2d 1244 (6th Cir. 1977); *De Arroyo v. Sindicato de Trabajadores Packinghouse*, 425 F.2d 281, 293 (1st Cir.1970); *Bygott v. Leaseway Transportation Corp.*, 637 F.Supp. 1433 (E.D.Pa.1986); *Chuy v. National Football League Players' Association*, 495 F.Supp. 137 (E.D.Pa. 1980); *but see Wood v. International Brotherhood of Teamsters*, 807 F.2d 493 (6th Cir.1986) (attorney's fees not awarded when plaintiffs did not prevail on the merits of the grievance against the employer), *cert. denied*, 483 U.S. 1006, 107 S.Ct. 3232, 97 L.Ed.2d 738 (1987).

 The union bears responsibility for any expenses incurred by the plaintiff as a result of its failure properly to pursue a grievance with the employer. A plaintiff may recover his expenses, including attorney's fees and costs, incurred in seeking a fair resolution of the claim against the employer. *Self v. Drivers, Chauffeurs, Warehousemen and Helpers Local Union No. 61*, 620 F.2d 439, 444 (4th Cir.1980). Attorney's fees are recoverable from the union as consequential damages flowing from the union's breach of the duty of fair representation. *Ames v. Westinghouse Corp.*, 864 F.2d 289, 293 (3d Cir.1988).

 The expenses a plaintiff incurs in obtaining legal representation and pursuing a contractual matter against his employer is not merely the result of the harm the union did him by its failure to fairly represent him; it is the harm itself. *Dutrisac v. Caterpillar Tractor Co.*, 749 F.2d 1270, 1275 (9th Cir.1983). An award that includes the plaintiff's expenses in prosecuting his DFR claim against the union would penalize the union for litigating the issue of whether it breached the DFR. An award of attorney's fees incurred in pursuing the union is improper unless it falls within an exception to the American Rule. *Id.* at 1275 n. 3.

 When the union refuses to represent the plaintiff in a grievance, the plaintiff's damages caused by this breach of the DFR are the attorney's fees incurred by the plaintiff. *Del Casal v. Eastern Airlines, Inc.*, 634 F.2d 295 (5th Cir. Unit B Jan. 1981).

 Included in the damages against the union is the amount reasonably expended in attorney's fees and other costs of prosecuting the claim against the employer. These are costs the employee would not have incurred but for the union's breach of its DFR. *Scott v. Local Union 377, International Brotherhood of Teamsters*, 548 F.2d 1244, 1246 (6th Cir.1977).

The attorney's fees incurred by the plaintiffs in their suit against their employer are damages caused by the union's breach of its DFR, regardless of the outcome of the suit against the employer. *Bygott v. Leaseway Transportation Corp.*, 637 F.Supp. 1433, 1442 (E.D.Pa.1986). Attorney's fees incurred in the suit against the union may be awarded against the union only as prescribed by the American Rule and its exceptions. *Id.*

 The case law discussed above recognizes that attorney's fees may be included as an element of damages in a DFR case. Attorney's fees and costs associated with pursuing the employer are assessed against the union because the damage to plaintiffs arose from the union's failure to proceed against the employer. Awarding the plaintiffs the attorney's fees incurred in prosecuting their DFR claim against the union would penalize the union for litigating the claim and defending itself at trial. Therefore, attorney's fees incurred in prosecuting the claim against the union may not be awarded. Under the theory of attorney's fees as damages, attorney fees are not imposed against the employer, but only against the union. An award of attorney's fees to the plaintiffs under this theory does not give the plaintiffs a full recovery of their attorney fees. The court will not award attorney's fees as a part of plain-

tiffs' damages in their DFR claim against UTU, since plaintiffs are able to recover fees for their entire case under the common benefit exception, discussed below.

### C. Common Fund

A litigant who recovers a common fund for the benefit of persons other than himself is entitled to a reasonable attorney's fee from the fund. *Boeing Co. v. Van Gemert,* 444 U.S. 472, 478, 100 S.Ct. 745, 749, 62 L.Ed.2d 676 (1980). The common fund doctrine "rests on the perception that persons who obtain the benefit of a lawsuit without contributing to its cost are unjustly enriched at the successful litigant's expense." *Id.; see Brown v. Phillips Petroleum Co.,* 838 F.2d 451, 454 (10th Cir.), *cert. denied,* 488 U.S. 822, 109 S.Ct. 66, 102 L.Ed.2d 43 (1988). Jurisdiction over the fund allows the court to prevent unjust enrichment by assessing attorney's fees against the entire fund, spreading fees proportionately among those benefitted by the suit. *Boeing Co. v. Van Gemert,* 444 U.S. at 478, 100 S.Ct. at 749.

The criteria of the common fund exception are met when each member of a class has an undisputed and mathematically ascertainable claim to a part of a lump-sum judgment recovered on his behalf. Once the class representative has established the defendant's liability and the total amount of damages, the members of the class may obtain their share of the recovery by proving their individual claims. *Id.* at 479, 100 S.Ct. at 749.

UTU argues that if fees are to be awarded, they should be taken out of the fund. UTU argues that the group benefitted by this litigation—the plaintiffs—should have to pay the attorney fees and costs.

This is not a common fund case. The named plaintiffs (Volkman et al.) did not recover a fund for the benefit of every member of the class whom they represent. Not all members of the class will recover money damages. There is no fund to be divided among the plaintiffs. This lawsuit did, however, result in a common benefit, not just to all members of the plaintiff class, but to all members of the UTU. The court shall address the common benefit in the next section.

The common fund exception to the American Rule is not the same as the common benefit exception. *See Pawlak v. Greenawalt,* 713 F.2d 972, 981 (3d Cir.1983), *cert. denied,* 464 U.S. 1042, 104 S.Ct. 707, 79 L.Ed.2d 172 (1984). Rather, the common benefit exception to the American Rule has developed well beyond the common fund theory. *Usery v. Local Union No. 639, International Brotherhood of Teamsters,* 543 F.2d 369, 382 (D.C.Cir.1976), *cert. denied,* 429 U.S. 1123, 97 S.Ct. 1159, 51 L.Ed.2d 573 (1977). *Brown v. Phillips Petroleum Co.,* 838 F.2d 451 (10th Cir.1988), cited by UTU, does not equate the common benefit exception with the common fund exception.

### D. Common Benefit

There is significant authority for awarding attorney's fees in labor law cases under the common benefit theory. *See Hall v. Cole,* 412 U.S. 1, 93 S.Ct. 1943, 36 L.Ed.2d 702 (1973); *Southerland v. International Longshoremen's Union Local 8,* 845 F.2d 796 (9th Cir.1987); *Pawlak v. Greenawalt,* 713 F.2d 972 (3d Cir.1983), *cert. denied,* 464 U.S. 1042, 104 S.Ct. 707, 79 L.Ed.2d 172 (1984); *Emmanuel v. Omaha Carpenters District Council,* 560 F.2d 382 (8th Cir. 1977); *Usery v. Local Union No. 639, International Brotherhood of Teamsters,* 543 F.2d 369 (D.C.Cir.1976), *cert. denied,* 429 U.S. 1123, 97 S.Ct. 1159, 51 L.Ed.2d 573 (1977); *McDonald v. Oliver,* 525 F.2d 1217 (5th Cir.), *cert. denied,* 429 U.S. 817, 97 S.Ct. 61, 50 L.Ed.2d 77 (1976); *Harrison v. United Transportation Union,* 530 F.2d 558 (4th Cir.1975), *cert. denied,* 425 U.S. 958, 96 S.Ct. 1739, 48 L.Ed.2d 203 (1976).

Attorney's fees may be awarded under this exception when the plaintiff's successful litigation confers "a substantial benefit on the members of an ascertainable class, and where the court's jurisdiction over the subject matter of the suit makes possible an award that will operate to spread the costs proportionately among them." *Hall v. Cole,* 412 U.S. 1, 5, 93 S.Ct.

1943, 1946, 36 L.Ed.2d 702 (1973) (quoting *Mills v. Electric Auto–Lite Co.*, 396 U.S. 375, 393–94, 90 S.Ct. 616, 626, 24 L.Ed.2d 593 (1970)). Before this court may award attorney's fees to the plaintiffs, the court must determine whether this litigation conferred a substantial benefit on the members of some ascertainable class.

■■■■ If the plaintiffs did not prevail on a claim, their lawsuit would not confer any common benefit on the membership of the union. *Bygott v. Leaseway Transportation Corp.*, 637 F.Supp. 1433, 1441 (E.D.Pa. 1986). In the present case, the plaintiffs prevailed against the SSW and the UTU on their principal claims against each, breach of contract and breach of DFR, respectively.

In the present case, plaintiffs vindicated their rights of fair representation. The plaintiffs secured a common benefit by vindicating their rights, as a minority group of employees, to fair representation at the hands of the UTU. The UTU intentionally sacrificed the rights of the plaintiffs so as to obtain benefits for another group of UTU members, the Pine Bluff Division employees. The right to fair representation for the minority group (plaintiffs) required that their rights and interests not be sacrificed without their knowledge merely to better the position of another group of UTU members (Pine Bluff Division). The right to fair representation required that the plaintiffs be represented and involved in the negotiating process. The vindication of the individual right to fair representation vindicates the rights of all UTU members to fair representation. It also vindicated their right to be involved in the negotiating and decisionmaking process on matters affecting their interests. The plaintiffs' victory in the present lawsuit will lessen the danger that other UTU members will be treated this way in the future. Only by awarding attorney's fees to be paid from the UTU treasury will the fees be spread proportionately over every UTU member. Attorney's fees shall be assessed against the UTU under the common benefit exception.

### E. Bad Faith

Plaintiffs argue that bad faith may be found either in the conduct giving rise to the litigation or during the course of the litigation itself. Plaintiffs state they are entitled to fees under either theory. Given the court's ruling on attorney's fees under the common benefit theory, the court shall not address whether attorney's fees are recoverable under the bad faith exception.

### F. Other Issues

■■■■ The court may tax expert witness fees in excess of the $30 per day witness fee only when the witness is court-appointed. 28 U.S.C. §§ 1821, 1920. *See Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 442, 107 S.Ct. 2494, 2497, 96 L.Ed.2d 385 (1987); *Miller v. Cudahy Co.*, 858 F.2d 1449, 1461 (10th Cir.1988), *cert. denied*, 492 U.S. 926, 109 S.Ct. 3265, 106 L.Ed.2d 610 (1989). Expert witness fees cannot be taxed as costs to the defendants beyond the statutory $30 per day witness fee.

■■■■ The United States Supreme Court has recently ruled that expert witness fees may not be shifted to the losing party in a civil rights action under the attorney fee statute 42 U.S.C. § 1988. *West Virginia University Hospitals, Inc. v. Casey*, —— U.S. ——, 111 S.Ct. 1138, 113 L.Ed.2d 68 (1991). The court believes this same principle to be applicable here. Plaintiffs' expert witness fees may not be shifted to the defendants as a part of the attorney fee award.

In the very last pleading filed on the attorney fee issue, UTU counsel states that "Defendant UTU presumes there will be a hearing on the attorneys' fee application pursuant to *Wulf v. City of Wichita*, 883 F.2d 842 (10th Cir.1989) ..." The court shall hold an evidentiary hearing on attorney fees following the entry of final judgment in favor of plaintiffs.

### VII. Rucker v. SSW

The defendants have not addressed the case *Rucker v. St. Louis Southwestern Railway Company*, No. 83–4262 (D.Kan.

May 17, 1988), *aff'd*, 917 F.2d 1233 (10th Cir.1990). *Rucker* also involved the purchase of the Tucumcari Line. The *Rucker* case was brought by a group of seven locomotive engineers and former Rock Island employees who were employees of defendant SSW. The plaintiffs were members of defendant International Brotherhood of Locomotive Engineers. The *Rucker* case arose from the same general transactions which gave rise to the present case before this court. *Rucker* differed, of course, in that it involved a different union, a different set of events following the March 4 agreement, and a different implementing agreement.

In an opinion dated May 17, 1988, Judge Rogers of this District granted defendants' motions for summary judgment. First, Judge Rogers ruled that the doctrine of primary jurisdiction provided a basis for dismissing the claims against the railroads. Primary jurisdiction is a discretionary doctrine allowing a court to decline jurisdiction over a case involving issues that an administrative agency has the expertise and opportunity to evaluate. Judge Rogers ruled that the Interstate Commerce Commission was better suited to resolve the dispute. Judge Rogers also ruled that the six month statute of limitations barred a portion of the plaintiffs' claims. Judge Rogers then ruled that no triable issue of fact existed on plaintiffs' claims against the union for breach of duty of fair representation. On appeal, the Tenth Circuit affirmed for the reasons set forth in the district court's memorandum and order. 917 F.2d 1233 (1990); *see* 917 F.2d at 1235–39 (Judge Rogers' memorandum and order).

This court declined to grant summary judgment on the basis of primary jurisdiction. *See* Doc. 138, at 10–20. This court addressed the statute of limitations issues in the summary judgment opinion and in the post trial opinion. *See* Doc. 138, at 20–30; 724 F.Supp. at 1317–19. The opinion in *Rucker* did not reflect that the plaintiffs exhausted their internal union remedies, which served to toll the statute of limitations in the present case. Finally, on the merits, the present case involved different facts. The implementing agreement between SSW and UTU was not the same as the document involving the SSW and the engineers' union. Further, in the present case, the labor representatives of the Rock Island employees were excluded from the negotiations of the implementing agreement. Judge Rogers' opinion in *Rucker* did not indicate that such conduct occurred in that case. For these reasons, the court finds *Rucker* distinguishable and no bar to the relief ordered by this court.

VIII. Reference to the Magistrate

The court shall refer this matter to Magistrate Wooley, who shall conduct any necessary hearings on the award of damages. Thereafter, the magistrate shall prepare a report and proposed findings of fact on the proper amount of back pay and other damages to be awarded to each plaintiff. Evidence to be presented at the hearings shall include all relevant SSW and Rock Island wage data necessary to compute the back wage awards and all mitigation of damage information. The hearings shall cover all plaintiffs originally awarded back pay as well as those plaintiffs who are awarded back pay in this opinion and order.[3] Additionally, Magistrate Wooley shall hold evidentiary hearings on the following matters: (1) whether plaintiffs E.C. Nuss, D.B. Hill and S.L. Gonzolas worked for the Rock Island as brakemen and were eligible for hire under the March 4 agreement; (2) whether plaintiff R.D. Parker, who was fired because he refused to report to work in Jefferson City, would have been terminated for cause had he been given a job pursuant to the March 4 agreement; and (3) the identity of any plaintiffs who are eligible for prior rights positions at Jefferson City pursuant to the court's ruling in this opinion and order.

**3.** Damages are to be awarded to the following individuals and groups: the 25 1983 hires plus Craig Jones; the 8 plaintiffs who should have been hired in July 1982 plus R.L. Garfield; and the 3 or 4 Eldon prior rights brakemen who are being allowed to transfer their prior rights positions to Jefferson City if they so desire.

IT IS BY THE COURT THEREFORE ORDERED that the motion for new trial, or to alter or amend judgment (Doc. 215) is hereby denied.

IT IS FURTHER ORDERED that the motion to alter or amend (Doc. 216) is hereby granted in part and denied in part.

IT IS FURTHER ORDERED that the amended motion to reconsider, reopen, amend, or for new trial (Doc. 248) is hereby denied.

IT IS FURTHER ORDERED that plaintiffs recalculate their damages in accordance with the rulings contained in this memorandum and order and file them with the court within 30 days of the date of this order.

IT IS FURTHER ORDERED that this matter is referred to Magistrate Wooley for further proceedings as indicated in this memorandum and order.

IT IS FURTHER ORDERED that the plaintiffs shall recover their attorney's fees from the United Transportation Union. The court shall hold an evidentiary hearing on the specific amounts requested at a later date.