854 F.Supp. 757 (1994)
Stephen T. AGUINAGA, Wayne Pappan, and Janet Brown, Individually and in behalf of all Union Members similarly situated, Plaintiffs,
v.
UNITED FOOD AND COMMERCIAL WORKERS INTERNATIONAL UNION, Defendant.
Civ. A. No. 83-1858-FGT.
United States District Court, D. Kansas.
May 16, 1994.
*758 *759 *760 Dennis M. Feeney, Ken M. Peterson, Morris, Laing, Evans, Brock & Kennedy, Chtd., Robert C. Brown, Brown, Dengler, Good & Rider, L.C., Wichita, KS, for Stephen T. Aguinaga, Wayne (NMI) Pappan and Janet (NMI) Brown.
Irving M. King, Peggy A. Hillman, Cotton, Watt, Jones & King, Chicago, IL, Annette M. Capretta, Donovan, Leisure, Rogovin & Schiller, Washington, DC, Paul H. Hulsey, Ness, Motley, Loadholt, Richardson & Poole, Charleston, SC, Richard Roesel, Asst. Gen. Counsel, UFCW, Washington, DC, for United Food and Commercial Workers Intern. Union.
Steven K. Hoffman, Guerrieri, Edmond & James, P.C., Washington, DC, Irving M. King, Peggy A. Hillman, Cotton, Watt, Jones & King, Chicago, IL, Gary K. Harris, Donovan, Leisure, Rogovin & Schiller, Harry Huge, Shea & Gould, Washington, DC, for United Food and Commercial Workers.

OPINION AND ORDER
THEIS, District Judge.
For of all sad words of tongue or pen, The saddest are these: "It might have been!"
James Greenleaf Whittier, "Maud Muller."
The peerless truth of that great American poet Whittier's couplet graphically illustrates the position this court is put in by the defendant's contention and the Tenth Circuit's admonition to determine by a preponderance of the evidence what a now non-party, John Morrell & Company, would have done concerning the work force and operation of its meat packing plant if its chicanery upon its labor force had not occurred, i.e., "what might have been." The court now turns to an analysis of the evidence in what is hoped to be the last episode in this ancient saga of the quest for terminable justice by a class of workers.
This is a hybrid breach of contract/breach of duty of fair representation brought by a class of 641 plaintiffs against their former employer, John Morrell & Company ("Morrell") and their union, the United Food and Commercial Workers International Union ("the Union"). This matter is before the court following the remand order of the Tenth Circuit Court of Appeals. Pursuant to the remand, the court conducted a rehearing on the damages to be awarded to the plaintiff class. Liability has been established; the jury's verdict as to liability was affirmed by the Tenth Circuit.
The plaintiffs are a group of former employees at Morrell's Rodeo meat packing plant located in Arkansas City, Kansas. Plaintiffs were all members of the Union. Morrell and the Union were parties to a collective bargaining agreement (the 1979 Master Agreement) which set the terms and conditions of employment. The 1979 Master Agreement was in effect until September 1, *761 1982 and from year to year thereafter unless proper notice was given.
In December 1981, Morrell issued a notice of closing for the Rodeo plant. Morrell represented that the closing would be permanent. The Rodeo plant closed as scheduled on June 19, 1982. Pursuant to the terms of the 1979 Master Agreement, the plaintiffs received severance benefits. In March 1983, Morrell reopened the Rodeo plant as the Ark City Packing Company (ACPC). ACPC was initially a nonunion plant. Morrell did not recall the Rodeo workers in seniority order and did not pay Master Agreement wages.
Following a trial on liability, the jury determined that Morrell had violated two provisions of the 1979 Master Agreement and that the Union had breached its duty of fair representation by failing the protect the plaintiffs' rights. The court thereafter awarded damages to all class members for a period of approximately fifteen months (from the date of the closing in June 1982 until September 1, 1983). Twenty-five percent of the damages were assessed against the Union. Both sides appealed various issues to the Tenth Circuit Court of Appeals.
The two primary holdings of the Tenth Circuit in this case were: (1) that damages were to be awarded from the date of the Rodeo plant closing until February 17, 1987, the date the court approved the plaintiffs' settlement with Morrell; and (2) that this court must consider the Union's evidence that not all members of the plaintiff class would have retained their jobs in the absence of breaches by Morrell and the Union. See Aguinaga v. United Food and Commercial Workers International Union, 993 F.2d 1463 (10th Cir.1993), cert. denied, ___ U.S. ___, 114 S.Ct. 880, ___ L.Ed.2d ___ (1994). The Tenth Circuit affirmed the liability issues and the court's method of apportioning damages. Pursuant to the remand order, this court conducted a rehearing on the backpay and related damages due the plaintiffs.
The purpose of an award of backpay (including fringe benefits) is to make employees whole for the losses suffered. Bowen v. United States Postal Service, 459 U.S. 212, 223, 103 S.Ct. 588, 595, 74 L.Ed.2d 402 (1983); NLRB v. Master Slack, 773 F.2d 77, 83 (6th Cir.1985). In unfair labor practice proceedings, the NLRB's task is to find a remedy that will restore the economic status quo that would have obtained but for the unfair labor practice. Remedies that award employees more than they would have received but for the violations are punitive and thus improper. See NLRB v. Fort Vancouver Plywood Co., 604 F.2d 596, 602 (9th Cir.1979), cert. denied, 445 U.S. 915, 100 S.Ct. 1275, 63 L.Ed.2d 599 (1980); see also Kallmann v. NLRB, 640 F.2d 1094, 1103 (9th Cir.1981); NLRB v. J.S. Alberici Construction Co., 591 F.2d 463, 468, 470 n. 8 (8th Cir.1979). Thus, only one recovery is allowed, even if the employer and the union committed multiple breaches. The damage formula the court chooses must give a close approximation of the amounts due. Damages need not be proven with exactitude, however. NLRB v. Overseas Motors, Inc., 818 F.2d 517, 521 (6th Cir.1987).

1. Wage rate
The court has previously ruled that the 1979 Master Agreement wage rate would be applied through September 1, 1982 and the 1982 Master Agreement rate would be applied until September 1, 1983. This ruling was not disturbed by the Tenth Circuit. The Union concedes the application of these wage rates from the beginning of the damage period until September 1, 1983. The Union argues that the issue of the relevant wage rate from September 1, 1983 through February 17, 1989 has not been decided by the court. The Union argues that the ACPC wage rate must be applied from September 1, 1983 through the end of the damage period. The court disagrees.
The Tenth Circuit's remand order instructed this court to determine what would have occurred absent the breaches by Morrell and the Union. As the Tenth Circuit noted in its opinion, the parties had had a long-standing relationship, and over the years they continued to negotiate new Master Agreements. The plaintiffs were not in jeopardy of losing their jobs simply because the 1979 Master Agreement expired. Plaintiffs, Morrell and the Union each contemplated a continued *762 contractual relationship between the expiration of the old Master Agreement and the negotiation of the next. As the Tenth Circuit also noted, there was a strong likelihood of future employment of the plaintiffs beyond the expiration date of the 1979 Master Agreement. A collective bargaining agreement beyond the 1979 Master Agreement was likely, and in fact a new Master Agreement was entered into in 1982. Absent the breaches, plaintiffs would have maintained continued employment at the Rodeo plant beyond the term of the 1979 Master Agreement. Aguinaga v. United Food and Commercial Workers International Union, 993 F.2d at 1478-79.
Absent the breaches which occurred in this case, the Rodeo plant would have continued to operate under a Master Agreement. The subsequent Master Agreements which were in fact negotiated would have governed the terms of employment at Rodeo.
Wage rates would have fallen at Rodeo even absent the breaches which occurred. In April 1983, Wilson and Company, a major pork producer, filed bankruptcy. Wilson subsequently reduced the wage rate paid to its production workers to approximately $6.50 per hour. Following a strike by the Union's employees at Wilson, an $8.00 wage rate was negotiated. The Wilson bankruptcy and subsequent wage cuts caused all the major packers to demand wage concessions. Other Master Agreement packers (including Morrell) demanded to meet with the Union to reopen contract negotiations.
In 1983, Morrell and the Union negotiated wage concessions for Morrell's remaining facilities  production plants in Sioux Falls, South Dakota and Estherville, Iowa and a distribution center in East St. Louis, Illinois. While the Estherville plant received a lower wage than Sioux Falls under the new wage agreement, the difference was only $.25 per hour. The Estherville plant was permanently closed during the time period at issue here. The East St. Louis facility was a distribution center at all relevant times. The Sioux Falls plant is the only production plant comparable to Rodeo. The court shall apply the wage rates applicable to the Sioux Falls plant. The new wage rates implemented at Morrell's Sioux Falls production plant reflect the industry-wide wage cuts experienced after the Wilson bankruptcy.
The court shall not apply the ACPC wage rate. Prior to the closing, Rodeo's production workforce was 100% union. Absent the breaches, the Rodeo plant would never have been nonunion. Morrell would not have been able to set unilaterally an initial wage rate of $5.00 per hour. There would have been no need for the Union to organize the workforce at ACPC. A contract separate and distinct from the Master Agreement would not have been negotiated.
The ACPC contract with the Union provided an initial wage of $7.00 per hour. This wage rate flowed directly from the breaches of contract and breaches of the duty of fair representation. Absent the wrongful conduct which actually occurred, it is more likely that the Rodeo plant would have been governed by the new Master Agreement in effect at the remaining Morrell plants. Absent the breaches, the Arkansas City plant would have remained a part of the Morrell "chain" and would have been governed by subsequent Master Agreements. Absent the breaches, the Master Agreement wage rates would have continued in effect. The new Master Agreement wage rates applicable at Sioux Falls shall apply to the remainder of the damage period.
Pursuant to the 1979 Master Agreement, production employees at Rodeo received a base rate of pay of $11.07 per hour. In July 1982 (after the closing of Rodeo), the Master Agreement rate of pay for Sioux Falls pork processing employees increased to $11.27 per hour due to a cost of living adjustment. The 1982 Master Agreement set a base rate of $10.69 per hour effective in September 1982. In October 1983, the wage rate fell to $8.25 per hour. Wages then rose in June 1985 to $8.75 per hour, then rose again in November 1985 to $9.00 per hour, and rose for the final time in November 1986 to $9.25 per hour. The $9.25 wage rate remained in effect through the end of the damage period being applied to the present case.

*763 2. Number of Plaintiffs Entitled to Damages
Plaintiffs have proposed awarding damages to all 641 plaintiff class members. The Union argues that fewer members of the plaintiff class are entitled to damages. The primary purpose of the damages rehearing was to allow the Union to present evidence that not all members of the plaintiff class would have retained their jobs even in the absence of breaches by Morrell and the Union. As pointed out by Tenth Circuit in this matter, the burden is on the defendant to prove by a preponderance of the evidence that an employee would have been discharged or laid off at a later date, or that the employee's job would have been phased out, even if no breach of contract and no breach of the duty of fair representation had occurred. Aguinaga, 993 F.2d at 1473.
The court must derive a figure approximating the total level of employment that would have obtained absent the breaches. Jobs would have been available according to seniority among all former Rodeo employees, including those who are not members of the plaintiff class.
In considering the remand order of the Tenth Circuit and the evidence presented by the Union, this court was struck by the difficulties inherent in making a determination of what would have happened if none of the breaches occurred. This court could find that the Rodeo plant would have employed virtually any number of workers between zero and 720, and award damages to anywhere from zero to all 641 plaintiffs. The Tenth Circuit's opinion did not foreclose relief to the entire class of plaintiffs. The final footnote in the Tenth Circuit's opinion instructed the court to reconsider its initial damage award in light of the Union's evidence. See Aguinaga, 993 F.2d at 1479 n. 5.
According to Union Exhibit U 3103, over the period 1977-1981, the Rodeo plant was the only Morrell plant to realize cumulative losses in the pork division. The total loss figure for the five year period, however, appears to have been only $100,000. The Rodeo plant's losses in the processed meats division for 1977-1981 totalled $1.8 million dollars, far less than the losses of $10.6 million at Morrell's Cincinnati plant. Between 1973 and 1981, the Rodeo plant realized a profit in only one year, 1979.
While the Rodeo plant may have been experiencing losses in the short term, Morrell nevertheless considered it a valuable plant. Morrell considered the Arkansas City facility one of the key plants in its chain. Morrell did not intend to discontinue the Rodeo brand or to abandon the Arkansas City facility. Morrell had the expectation of future profits even if, in the short term, it was experiencing losses at the Rodeo operation. Believing that the Arkansas City facility had the potential for future profits, Morrell invested some $3 to $5 million into renovating the Rodeo plant shortly before closure. Morrell ceased producing beef at Rodeo approximately six months prior to the closure. After reopening the plant, Morrell sought to concentrate less on processing and more on pork kill and cut.[1] In this manner, Morrell hoped to make the Arkansas City facility profitable again.
The court has considered the evidence regarding trends in the meatpacking industry. The entire meatpacking industry experienced wage cuts during the damage period. Wage concessions would have occurred even absent Morrell's breaches of contract. Morrell had no plan for a reduction in force as such. Morrell's main objective during the relevant time period was to decrease its labor costs drastically through low wages and an increased rate of production.
At the damages rehearing, the Union presented evidence regarding employment levels *764 at ACPC which were admittedly based on estimates and assumptions. The Union's evidence was a cut-and-paste affair, consisting of mounds of documents obtained from a variety of sources. Subsequent to the damages rehearing, the court ordered to parties to submit evidence regarding the actual employment levels at ACPC.
The Union produced no official of either Morrell or its parent company United Brands to testify either in court or by deposition, nor any affidavits from responsible decision makers in the Morrell management hierarchy as to what Morrell would have done legally under the Master Agreement in the absence of the breaches.[2]
The evidence presented by the Union was hypothetical and speculative. More significantly, however, the Union's evidence was based on a faulty premise  that, absent the breaches of contract, Morrell would have done exactly what it did in the presence of the breaches of contract. The court did not find persuasive the evidence which the Union presented to support its position. The court cannot find that Morrell would have taken the same actions if it had acted lawfully as it did when it acted unlawfully. Had Morrell wished to implement a layoff and reduction in force pursuant to lawful means, it could have done so under the express terms of the Master Agreement. However, Morrell did not do so and there was no evidence that Morrell ever intended to do so.
The Union's reduction in force evidence was geared entirely toward proving its position that, absent the breaches, Morrell would have taken the same actions. While it may be appropriate to look at what actually happened subsequent to the breach, the Union cites no case law mandating that this court blindly adopt Morrell's post-breach actions as determinative of what Morrell would have done in the absence of the breaches. The Union argues that Morrell's staffing level decisions were not a breach of contract and that the jury was not instructed to consider Morrell's actions in staffing ACPC in considering whether a breach of contract occurred. This argument misses the point. The closing of the Rodeo plant to avoid the obligations of the Master Agreement allowed Morrell to implement its plan to reopen Rodeo nonunion as ACPC. The reopening of ACPC cannot be separated from the improper closing of Rodeo. What occurred at ACPC flowed directly from the breaches and cannot be neatly divorced from the breaches. The staffing of ACPC, rather than showing what Morrell would have done absent the breaches, merely shows what Morrell did do to complete the breaches.
The court has examined the cases cited by the Union. The court does not disagree with the general principles discussed therein. To toll back pay, the burden is on the defendant to show by a preponderance of the evidence that the employer would have terminated the plaintiffs for legitimate business reasons on the same or some future date. E.g., Bales v. NLRB, 914 F.2d 92, 94, 95 n. 2 (6th Cir.1990); see Shaw College at Detroit, Inc. v. NLRB, 623 F.2d 488 (6th Cir.1980). When a plant has been closed for purely economic reasons, and not from anti-union animus, it is appropriate to cut off back pay liability to discriminatees as of the date of the closing of the plant. NLRB v. Master Slack, 773 F.2d 77 (6th Cir.1985). When the record reflects a real (not hypothetical) event triggering the cessation of work, an award of back pay need not continue beyond that date. See New York Urban Coalition, Inc. v. United States Department of Labor, 731 F.2d 1024 (2d Cir.1984) (expiration of government contract signalled end of back pay liability to discriminatee; all employees ceased receiving wages when project terminated). When an employee is laid off for discriminatory *765 reasons, it is appropriate to look at whether work was available which the discriminatee would have performed absent the layoff. See NLRB v. United Contractors, Inc., 713 F.2d 1322 (7th Cir.1983). The availability of jobs is to be determined, not by the actual closing date of a business, but by when the employer, in the exercise of reasonable business judgment, would have been forced to close the business due to financial losses. See Mastell Trailer Corp. v. NLRB, 682 F.2d 753 (8th Cir.1982).
The court does not agree with the proposition derived from these cases by the Union, i.e., that it is necessary for this court to rely upon Morrell's post-breach actions as indicative of what Morrell would have done absent the breaches. The cases cited by the Union do not support its position.
The Union has attempted to prove that Morrell would have laid off the plaintiffs for permissible reasons on the same date it discharged them for impermissible reasons. The court finds no credible evidence that Morrell would have temporarily shut down the Rodeo plant and laid off the entire Rodeo workforce absent the breaches.
At the time of the closing of the Rodeo plant, the work force consisted of approximately 720 bargaining unit employees. When ACPC opened, it employed significantly fewer employees than had been employed at Rodeo. ACPC opened with an initial complement of approximately 200 workers. Employment levels at ACPC never reached the level of employment previously experienced at Rodeo. However, employment continued to rise at ACPC during the term of the damage period. By May 1988, there were roughly 600 bargaining unit employees at ACPC. In 1989, Morrell closed ACPC. The plant remains closed to this day.
The stipulation on employment levels at ACPC submitted after the damages rehearing (Doc. 890, Joint Exh. 1) reveals the following. When the plant reopened as ACPC, 210 persons were employed. While there were fluctuations in employment levels, the overall trend was upward throughout the damages period. By year, the maximum employment levels were as follows: in 1983, 395 employees (December); in 1984, 442 employees (December); in 1985, 497 employees (November); in 1986, prior to the strike, 421 employees (April and May); in 1986, during the strike, 516 employees (November); and in 1987, 438 employees (February; only two months in the damage period).
During the strike at ACPC from July 1, 1986 until February 1, 1987, employment at the plant was as follows: 301 (week ending July 5, 1986); 58 (week ending August 2); 467 (week ending August 30); 474 (week ending September 27); 482 (week ending October 4); 516 (week ending November 1); 496 (week ending December 6); 439 (week ending December 27); and 426 (week ending January 31, 1987). Morrell continued to operate during the course of the strike with strike-breakers and permanent replacements.
Since production and sales of Rodeo brand products increased during the damage period, employment at Rodeo would have remained stable, at least in the short term, absent the breaches by Morrell. To produce the same amount of Rodeo products as was produced before the closure would have required approximately the same level of employment as existed prior to the closure.
The court shall award damages to all class members for the period from the Rodeo plant closing until the end of August 1983. The fact that Morrell was able to increase production and sales of Rodeo brand products after the Rodeo plant closed is evidence that the Rodeo plant would have maintained its preclosing workforce size for a period of time. Beginning September 1, 1983, the court finds that Morrell would have begun to decrease its work force from the preclosing level of 720. The court finds that a total employment level of 500 (which was achieved approximately October 1, 1985, see Joint Exh. 1) approximates what would have occurred absent the breaches. There is no formula the court could reasonably ascertain from the evidence which would determine the work force with exactitude under the "what might have been" scenario mandated by the Tenth Circuit.
Absent the breaches by Morrell, the Rodeo plant would not have closed. The start-up *766 process and corresponding gradual increase in employment would have been avoided. Instead, Morrell would have begun the process of laying off its least senior employees to take into account the shifts in production that it intended to implement at the plant.
From the beginning of the damage period until the end of August 1983, employment at Rodeo would have remained at the preclosing level of approximately 720 employees. Thus, all 641 plaintiffs are entitled to damages through this period. From the beginning of September 1983 until the beginning of October 1985 (a total of 25 months), Morrell would have gradually reduced employment by 220, from 720 to 500. As an approximation of what would have occurred absent the breaches, the court finds that Morrell would have laid off the nine least senior employees per month (effective on the last day of the month) until a total employment level of 500 was reached by October 1, 1985.[3] Jobs would have been available to the Rodeo employees by virtue of seniority. Thus, all former employees, class members and nonclass members alike, would have been eligible for employment. Class members lacking sufficient seniority for employment in available positions will not be entitled to recover damages.
For those class members entitled to damages who became disabled, reached age 65, or died during the damage period, damages shall run until the date the relevant event occurred. At the point at which a class member's damages are cut off, a position becomes available for the next person on the seniority list.
The court shall not cut off damages for the period of the ACPC strike. Class member Donald Palmer testified that the strike occurred when the ACPC contract expired in 1986 and Morrell again demanded wage cuts. In the absence of the breaches which occurred in this case, the Rodeo plant would have remained subject to the Master Agreement. The ACPC contract would not have come into existence. The economic strike which occurred upon the expiration of the ACPC contract would not have occurred.
However, the court does find that damages should be cut off during the time period of the strike at Sioux Falls. If a strike would have occurred at Rodeo, it would have coincided with the expiration date of the Master Agreement. Since there was a strike at Sioux Falls during the damage period, the court shall cut off damages for that time period, instead of the time period of the ACPC strike. Morrell Vice President James Hurley testified that there was a strike at Sioux Falls in the fall of 1985 which lasted approximately 12 weeks. The strike began on September 1, 1985  the expiration date of the 1982 Master Agreement  and lasted until approximately November 11 or November 16, 1985, according to Hurley. A new agreement governing Sioux Falls was reached on November 20, 1985. Exh. U 1606. The parties should be able to stipulate to the exact time period of the strike.
The Rodeo workforce was 100% union. Absent the breaches by Morrell and the Union, there would have been no change in the percentage union membership. As loyal union members, the plaintiffs would have participated in the strike which occurred in Sioux Falls in the fall of 1985. No damages shall be awarded for the time period of the strike. The court shall award damages based on an employment level of 500 for the period following the Sioux Falls strike.
The court's findings herein are consistent with the case law. The Union has cited no cases which require the court to blindly follow what Morrell actually did in implementing its breaches. Had the damage period in this case extended beyond 1987, however, it may have been appropriate to consider the fact that the Arkansas City plant closed in 1989. By all indications, this closing is indeed permanent.
The court's determination regarding the level of employment that would have obtained absent the breaches is consistent with the general evidence regarding a downturn in the meat packing industry during the relevant time period. The gradually decreasing number of plaintiffs entitled to damages reflects *767 that, absent the breaches which occurred, the level of employment at the Rodeo plant would likely have decreased somewhat.

3. Pension and Health Benefits
When an employee is ordered reinstated, the court may add to the award the contributions the employer would have made to the pension fund. The award will consist of payments to the pension fund on the plaintiff's behalf to bring the plaintiff's pension interest up to the level it would have been absent the discrimination. Loeb v. Textron, Inc., 600 F.2d 1003, 1021 (1st Cir.1979) (Age Discrimination in Employment Act). When reinstatement is not ordered, pension damages should approximate the present discounted value of the plaintiff's interest. The award should be computed as if the plaintiff had been employed until the date the damages are settled. Id. Pension rights are proper elements of damage and their present value is recoverable based on expert testimony. Kelly v. American Standard, Inc., 640 F.2d 974, 986 n. 20 (9th Cir.1981) (Age Discrimination in Employment Act). A pension award is allowed unless the record reflects that plaintiffs secured equivalent pension benefits with interim employers. Smyth Mfg. Co., 277 N.L.R.B. 680, 683 n. 12, 1985 WL 46075 (1985). The burden must be placed on the defendant to show equivalency of new pension benefits, as this is in the nature of a setoff.
John Powers, director of pension and benefits for Morrell, testified by deposition regarding the pension and health care plans covering Morrell's plants. Under the 1979 Master Agreement, an employee was entitled to receive a pension benefit per month in the amount of $15 per year of service. In October 1983, the pension benefit applicable to Sioux Falls changed to $10 per month multiplied by years of service. A Sioux Falls retiree would thus be eligible for a monthly pension benefit in the amount of $15 per year of service up to 1983, and $10 per year of service after 1983.
The court has previously addressed the discount rate and interest rate to be applied to the pension benefit calculation. The plaintiffs' expert applied a discount rate of 8%, which was derived from the Unisex Mortality Table of the Pension Benefit Guaranty Corporation. The court sees no inconsistency with using an 8% discount rate and a 10% prejudgment interest rate. The 8% discount rate is actuarially sound. The 10% prejudgment interest rate is set by statute, K.S.A. 16-201. The court's findings on these matters were not disturbed on appeal.
The court adopts plaintiffs' pension benefit calculations as correct. The court found the testimony of plaintiffs' actuary Michael Johnston to be more credible than the testimony of defendant's accountant Susan Mackie. Johnston indicated that it was actuarially sound to offset pension receipts against pension losses. Johnston performed the calculations in this manner to address an issue raised in an affidavit previously submitted by the Union's actuary. The Union's actuary did not testify at the damages rehearing.
The Union's actuary Stanley Goldfarb submitted an affidavit in 1990 during the prior damage proceedings. Goldfarb criticized Johnston for failing to offset against the pension damages the pension benefits actually received by the plaintiffs during the course of the damage period. The plaintiffs had treated pension benefits received as a general setoff, rather than a setoff against pension damages specifically. While making his pension damage computations for the lengthened damage period on remand, Johnston heeded Goldfarb's advice and used pension benefits received during the damage period as a setoff against pension damages.
On the issue of pension setoffs (i.e., pension benefits actually received by members of the plaintiff class), the Union's accountant Mackie complained that needed information was missing. The plaintiffs' accountant Gary Poore testified that he was unaware of any relevant or necessary data being withheld from the Union. Since 100% of the pension benefits received by class members was taxable, the plaintiffs' tax returns (already provided to the Union) contained all the information necessary to determine the actual amount of pension benefits received. According to the credible testimony presented at the hearing, the Union was already in *768 possession of the information it needed to compute pension setoffs for each plaintiff who received pension benefits from Morrell during the damage period. The Union's position that plaintiffs have withheld information from the Union is unworthy of belief.
The Union argues that excess interim earnings be carried over to reduce any plaintiff's pension damages. The Union also argues that excess pension receipts (actual pension benefits received over pension losses calculated) be carried over to reduce the backpay damage award. Since plaintiffs' actuary presented a net pension damages figure, the Union's accountant spent a great deal of time and effort attempting to compute the gross figures, in order to derive an excess pension benefits figure. By the court's estimation, this "excess pension setoff" figure was, at best, a very rough estimation, and, at worst, a figment of Union counsel's imagination. The sole purpose in computing this figure was to conjure up an offset against backpay damages.
The court finds that it is unsound, both under the law and under accepted accounting and actuarial principles, to setoff earnings against pensions and vice versa. These two components of the damage award are computed in greatly different manners. Interim earnings are a straightforward matter derived from the plaintiffs' tax returns. Pension losses require the efforts of an accountant and an actuary and involve the use of mortality statistics and an appropriate discount rate. It is indeed the comparison of apples and oranges to lump together both categories of damages.
Setoffs from one category shall not be carried over into another category of damages. Any setoffs applicable to one plaintiff shall not be applied to reduce the damages awarded to any other plaintiff.
Since interim earnings shall not be carried over to reduce pension damages, it is to be expected that some plaintiffs may receive little or no back pay but be entitled to an award of pension damages. A plaintiff who properly mitigated his damages by obtaining higher-paying interim employment may still have suffered pension losses. Certain plaintiffs (e.g., C.H. Banks) would have become vested in the Morrell pension had their employment continued beyond the Rodeo closing date. Certain plaintiffs (e.g., D.E. Keeler) would have reached thirty years of service had their employment continued beyond the Rodeo closing date. These thirty year veterans would have been eligible for immediate retirement, regardless of age, with a supplement of $100 per month (over and above the regular pension amount) until they reached age 65. These plaintiffs will be seen to have larger pension damages than other members of the plaintiff class.
It merits repeating that the Union bears the burden of proof on setoffs. As the court noted above, an award of pension damages is appropriate unless the record shows that the plaintiff received an equivalent pension benefit through his or her interim employment. The Union has failed to show that any plaintiff has received an equivalent pension benefit.
The Union must do more than point to carefully selected individual plaintiffs and argue that their damages are "excessive." Given the manner of calculating damages, certain plaintiffs will recover larger damage awards than others. The fact that certain plaintiffs will recover larger damage awards than other plaintiffs does not make those larger damage awards "punitive," a common refrain in the Union's briefs. While not ever stating as much, the Union's litigation position appears to be that any award of damages that it will have to pay is "punitive."
There appears to be no particular dispute with the method used for calculating lost health benefits. The court shall adopt the plaintiffs' computations.

4. Mitigation of Damages, Including Setoffs for Interim Earnings
The burden is on the plaintiffs to prove the gross amounts of backpay and related damages due each of them. The burden then shifts to the defendant to demonstrate any reductions in the amount of backpay or any facts which would mitigate its liability. Lundy Packing Co. v. NLRB, 856 F.2d 627, 629 (4th Cir.1988); Kawasaki Motors Mfg. Corp., U.S.A. v. NLRB, 850 F.2d *769 524, 527 (9th Cir.1988); NLRB v. Overseas Motors, Inc., 818 F.2d 517, 521 (6th Cir. 1987); NLRB v. Laredo Packing Co., 730 F.2d 405, 407 (5th Cir.1984) (per curiam).
A backpay claimant has a duty to mitigate his damages. A claimant's failure to search for alternative work, his refusal to accept substantially equivalent employment, or his voluntary quitting of alternative employment without good cause constitute affirmative defenses to backpay liability. Laredo Packing Co., 730 F.2d at 407. A claimant is not required, however, to accept anything other than suitable interim employment. Id. at 408. The reasonableness of a claimant's efforts to secure substantially equivalent employment is determined by, inter alia, the economic climate and the worker's skill, qualifications, age, and personal limitations. Lundy Packing Co., 856 F.2d at 629.
The Tenth Circuit's opinion in this case provides: "Employees claiming entitlement to back pay and benefits are required to make reasonable efforts to mitigate damages. Once back pay and benefits have been awarded, the burden is on the employer to show that the claimant did not exercise reasonable diligence in mitigating his or her damages. To satisfy this burden, the employer must establish that: (1) there were suitable positions which the claimants could have discovered and for which they were qualified, and (2) the claimants failed to use reasonable diligence in seeking such positions." Aguinaga, 993 F.2d at 1474 (citations omitted). The burden is on the Union to satisfy both prongs of this two-part test. Id.
The burden is not placed on the employee to prove a "systematic method of searching for a job." NLRB v. Westin Hotel, 758 F.2d 1126, 1130 (6th Cir.1985).

A. Availability of Suitable Jobs  In General
The testimony presented at the rehearing demonstrated that employment was not readily available in the Arkansas City area during the time period under consideration. In general, employment was difficult to obtain. The Union has not met its burden of proving the availability of suitable jobs in the relevant geographic area which the plaintiffs could have obtained.
Plaintiffs have designated testimony regarding the difficulties various individuals experienced in obtaining employment after the closing of Rodeo. The court refers specifically to the trial testimony of Stephen T. Aguinaga; the deposition of James Brown; the trial testimony of Booker Jennings; the deposition of Kenneth Mauzey; the deposition of Gary Meyer; the deposition of Lyall Moore; the deposition and trial testimony of Wayne Pappan; the deposition of Raymond Powders; and the deposition of Warren Stout.
The testimony of defendant's witness Philip "Joe" Phillips, president of Union Local 340, was consistent with the testimony of the class members. Phillips testified at the damages rehearing that it was almost impossible to find employment in Arkansas City after Rodeo closed. Between 2,000 and 3,000 people applied for the approximately 200 jobs available when ACPC reopened. No other Union witness testified regarding the availability of jobs in the Arkansas City area.
Counsel for the Union noted at the damages rehearing that the Union still desired to hold individual hearings before the Magistrate Judge regarding each class member's attempts at mitigation of damages. The court has previously rejected this position. Since the Union has again failed to demonstrate the availability of suitable jobs, individual inquiry into whether a plaintiff used reasonable diligence in seeking employment is unnecessary. Individual inquiry would be unduly burdensome and simply appears to be an attempt to delay the final resolution of this matter.

B. Availability of suitable jobs  ACPC
Employment at ACPC was not substantially equivalent employment to that previously available at Rodeo. The court makes this determination based in large part on the testimony presented by the Union's witnesses at the damage rehearing. Employment at ACPC was difficult to obtain. Applicants outnumbered initial hires by at least 10 to 1. The wage rate paid was cut in half, while the speed at which the work was to be performed *770 was increased. Given the increased speed in an admittedly dangerous industry, the work was more difficult and more dangerous. Employees did not receive proper training. As a result, they suffered injuries and accidents and were fired by Morrell. ACPC employees suffered a higher level of accidents and injuries on the job than was the case at Rodeo. Turnover rates were high, given Morrell's propensity to fire its injured workers. A Union witness testified that initially at ACPC turnover was probably in excess of 80%. While turnover rates fell significantly from this initial level, the rate of turnover at ACPC was far greater than that experienced at Rodeo.
Since employment at ACPC did not constitute substantially equivalent employment, the failure of any plaintiff to work at ACPC does not constitute a defense to backpay liability.

C. "Reinstatement" at ACPC
The Union argues that damages should terminate for any Rodeo employee who was "reinstated" at ACPC. The Union cites the Tenth Circuit's opinion in support of this proposition. However, the Tenth Circuit's opinion does not provide support for the Union's position. In discussing general principles applicable to back pay awards, the Tenth Circuit's opinion provides, "Back pay liability normally runs until the employer makes a valid, unconditional reinstatement offer. A back pay claimant who rejects a valid reinstatement offer is therefore not entitled to back pay for the period after the rejection of the offer. In the same manner, a waiver of all rights to reinstatement via a settlement with the employer operates to cut off all liability for back pay." Aguinaga, 993 F.2d at 1479 (citations omitted). From this statement of generally applicable principles, the Tenth Circuit concluded that damages should run to the date of the plaintiffs' settlement with Morrell. Id.
The Tenth Circuit did not rule that upon going to work at ACPC, a plaintiff's damages must cease. Any offers of employment at ACPC were not valid, unconditional reinstatement offers. A job at ACPC was not "reinstatement," since the former Rodeo employees were given no particular preference in hiring and were not recalled in seniority order. Former Rodeo employees did not keep their Rodeo seniority and were treated as new hires by Morrell. The wage rate offered was not the Master Agreement rate. Further, the court has found that the Master Agreement wage rates applicable to Sioux Falls would have applied at Rodeo absent the breaches. Since the court is applying the Sioux Falls wage rate for the remainder of the damage period, the plaintiffs cannot receive a "make whole" damage award if their damages are based on the wage rate actually paid at ACPC.

D. Plaintiffs Who Did Not Work at ACPC
The Union argues that a refusal to work at ACPC should result in a limitation on the amount of each plaintiff's damages. The Tenth Circuit's opinion was very clear on the issue of the length of the damage period: "... damages must be awarded to Plaintiffs from the date of the Rodeo Plant closing until February 17, 1987  the date that the settlement between Plaintiffs and Morrell was approved by the court. Back pay liability normally runs until the employer makes a valid, unconditional reinstatement offer. A back pay claimant who rejects a valid reinstatement offer is therefore not entitled to back pay for the period after the rejection of the offer. In the same manner, a waiver of all rights to reinstatement via a settlement with the employer operates to cut off all liability for back pay. Applying this general rule of awarding back pay and benefits until rejection of an offer of reinstatement is the only way Plaintiff can be made whole  i.e., put in the same position as if Morrell had not breached the 1979 Master Agreement and the Union had not breached its duty of fair representation. Accordingly, we remand to the district court for calculation of Plaintiffs' damages from June 19, 1982 until February 18, 1987." Aguinaga, 993 F.2d at 1479 (citations and footnotes omitted).
The Tenth Circuit did not rule that a failure to work at ACPC would cut off a plaintiff's damages. As discussed above, a job offer from ACPC did not constitute a valid, unconditional reinstatement offer sufficient to cut off liability for back pay. An offer of *771 employment at ACPC was neither "valid" nor a "reinstatement" offer. Employment at ACPC was not offered pursuant to the terms of the Master Agreement. Master Agreement wages and benefits were not paid. Employees were not hired in their Rodeo seniority order. ACPC employees were treated as new hires, not as reinstated employees with Rodeo seniority. Union witness Susan Miller was incorrect when she testified that the former Rodeo employees were hired at ACPC on the basis of their Rodeo seniority.
Employment at ACPC did not constitute reinstatement. Similarly, as the court has previously found, ACPC was not substantially equivalent employment. Working at ACPC was not equivalent to reinstatement at Rodeo. It is not reasonable to expect each and every member of the plaintiff class to return to work at the same physical location, but to perform a dangerous job at a higher rate of speed for half the previous wage. The Union's argument to the contrary is not supported by the law and is unworthy of credence.
The Union has geared its setoff arguments entirely around the availability of work at ACPC. For the reasons the court has already specified  reasons which should be obvious to even the most casual observer  employment at ACPC did not constitute a suitable job. In the absence of a showing of the availability of suitable jobs in the Arkansas City area, it is inappropriate to impute an average level of interim earnings to the plaintiffs.
This court's decision in Volkman v. United Transportation Union, 770 F.Supp. 1455, 1472 (D.Kan.1991) is not to the contrary. In Volkman, the court imputed to all plaintiffs a level of interim earnings based on the earnings of less senior employees. The Volkman plaintiffs could have displaced (or "bumped") the less senior employees and thus could have earned at least as much as those less senior employees. The work performed by the less senior employees was the same work and was available to the plaintiffs. The absence of these facts in the present case makes imputing interim earnings to the plaintiffs inappropriate. There were no jobs for the former Rodeo employees to "bump" into.

E. Setoffs for Interim Earnings
Setoffs for interim earnings are to be calculated on a yearly basis. The court shall not carry forward a negative damage number as proposed by the Union. This holding is consistent with this court's ruling in Volkman v. United Transportation Union, 826 F.Supp. 1253, 1263 (D.Kan.1993). This holding is also consistent with the law applicable in backpay proceedings before the NLRB. See F.W. Woolworth Co., 90 N.L.R.B. 289 (1950); NLRB v. Seven-Up Bottling Co. of Miami, 344 U.S. 344, 73 S.Ct. 287, 97 L.Ed. 377 (1953) (affirming Woolworth rule; backpay to be determined on a quarterly basis; interim earnings in one calendar quarter have no effect on backpay liability for any other quarter).
Plaintiffs have calculated their damages on an annual, rather than quarterly, basis. Plaintiffs assert that quarterly figures were not available and that annual figures simplify the computation of damages. Neither the plaintiffs nor the Union seeks to have damages calculated on a quarterly basis.
The original damage period was slightly more than one year long. Given the short length of the original damage period, it made no sense from an accounting standpoint to split the damage period into two calendar years. This computational method simplified the original damage computation. The present damage period runs for almost five years, and encompasses four complete calendar years (1983 through 1986). Individual income tax returns are prepared on a calendar year basis. The court finds that determining setoffs on a yearly basis is appropriate from an accounting standpoint as well as a legal standpoint.
The Union's only argument to the contrary is that the computational method is the law of the case. Defendant cites one case in its brief (Doc. 789) which it asserts is "precisely in point." Fox v. Mazda Corporation of America, 868 F.2d 1190, 1194-95 (10th Cir. 1989) (Fox II). A reading of Fox II demonstrates that the case is readily distinguishable. *772 In a prior appeal of the same case, the Tenth Circuit had specifically addressed the issue of the appropriate measure of damages. Fox v. Mazda Distributors (Gulf), 806 F.2d 953 (10th Cir.1986) (Fox I).
The plaintiffs in Fox I had brought suit against various Mazda entities, challenging Mazda's method of allocating vehicles to Mazda dealerships. Plaintiffs brought two antitrust claims and a claim under the Automobile Dealers' Day in Court Act, 15 U.S.C. § 1221 et seq. A jury found in favor of the plaintiffs on all three claims and the court entered a treble damage award. In the first appeal, the Tenth Circuit affirmed liability against defendant Gulf under the Automobile Dealers' Day in Court Act, but reversed the verdict against defendants Gulf and Central on the antitrust claims. The damage award was set aside and the action was remanded for a new trial on damages only. Fox I, 806 F.2d at 961.
At the first trial, the plaintiffs had presented a damage model based on lost profits, which purported to represent their damages under all three claims and against both defendan. The jury returned one damage verdict for all claims. Because it was impossible to determine on what basis the jury computed the damages, a new trial was necessary to assess damages against only defendant Gulf and only under the Automobile Dealers' Day in Court Act. Fox I, 806 F.2d at 961. The Tenth Circuit held that, on retrial, damages were to be based on the losses attributable to defendant Gulf's discriminatory allocation of vehicles. The actions of defendant Central, who was not liable under the Dealers' Act, was not to be considered. Id.
In the second appeal, the question presented was whether the district court had erroneously restricted the plaintiffs' proof of damages. Fox II, 868 F.2d at 1193. The district court had disallowed certain testimony and a damage model which projected the plaintiffs' loss of profits and loss of dealership market value. The district court held that this damage model was contrary to the remand in Fox I. The district court interpreted the Tenth Circuit's mandate as allowing for the recovery of damages based on the number of vehicles the plaintiffs would have received if the vehicles had not been wrongfully allocated to other dealers. Fox II, 868 F.2d at 1194. The Tenth Circuit in Fox II held that the district court had not abused its discretion in disallowing the proffered evidence. The Tenth Circuit noted that the plaintiffs' damage evidence on remand "went well beyond the bounds of our remand" order. Fox II, 868 F.2d at 1194-95.
This rather lengthy discussion of the procedural background of the Fox cases demonstrates how far from "on point" they are to the present action. The present case, unlike the Fox cases, involves one defendant and a damage model based on one theory of recovery. Unlike Fox I, in the (first) appeal of the present case, the Tenth Circuit did not address the issue of the appropriate damage calculation methodology. The Tenth Circuit opinion nowhere addressed the issue of the appropriate method of calculating setoffs for interim earnings. The damage methodology constituted law of the case in Fox II because the district court was bound to adhere to the mandate of the Tenth Circuit in Fox I on the allowable measure of damages.
The Union argues in its Motion for Judgment as to Invalidity of Plaintiffs' Damages Model (Doc. 789) that neither it nor the plaintiffs challenged on appeal the damage model proposed by the plaintiffs and adopted by this court. This court can only assume that the Union did not challenge this matter on appeal, since the Tenth Circuit did not address it. The Union's failure to appeal this issue could have been deliberate or inadvertent. The plaintiffs would have had no reason to appeal the damage computations as they proposed.
Notwithstanding this apparent failure to challenge this issue on appeal, the court cannot find that this issue has been waived or constitutes the law of the case. This court did not address the specific issue in its prior orders on damages. The Tenth Circuit did not address this specific issue. "The rule that a lower court must follow the decision of a higher court at an earlier stage of the case applies to everything decided `either expressly or by necessary implication.'" Cherokee Nation v. Oklahoma, 461 F.2d 674, 678 (10th *773 Cir.) (citation omitted), cert. denied, 409 U.S. 1039, 93 S.Ct. 521, 34 L.Ed.2d 489 (1972).
Unlike the various rules of res judicata, the more amorphous concept of law of the case determines whether a court's prior decision on a rule of law should continue in force in subsequent stages of the same case. Arizona v. California, 460 U.S. 605, 618, 103 S.Ct. 1382, 1391, 75 L.Ed.2d 318 (1983). As it is most frequently applied, law of the case encompasses a lower court's adherence to its own prior rulings, to the rulings of its superior court in the case, or to the rulings of another judge or court in the same case or a closely related case. The final category of law of the case involves the consequences of failure to appeal an issue. 18 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 4478, at 788 (1981).
Under the first category of law of the case, questions that have not been decided do not become law of the case simply because they could have been decided. However, law of the case principles may apply when a court concludes that an issue was decided implicitly. Id. § 4478, at 789. In the present case, this court never explicitly decided the particular issue being raised by the Union. Nor does the court find that the matter was implicitly determined. Given the length of the damage period initially determined by this court, the computation of setoffs on an annual versus an aggregate basis was simply not an issue.
The second category of law of the case simply refers to the "mandate rule"  the principle that a lower court is bound to honor the mandate of a superior court. Lower courts are free to decide issues that were not resolved in a prior appeal, as long as the case remains open for further proceedings. Id. § 4478, at 792-93. The issue presented by the Union was not resolved by the Tenth Circuit in the prior appeal, and the court does no violence to the mandate rule by considering the issue herein.
The third category of law of the case determines the amount of deference one judge or court owes to the rulings of another judge or court in the same case or in a closely related case. This aspect of law of the case doctrine is inapplicable here.
A less common fourth aspect of the doctrine covers circumstances under which courts will give preclusive effect to a ruling that could have been appealed, but has been abandoned by a failure to do so. Id. § 4478, at 801. Professors Wright, Miller and Cooper call this "[t]he last and least important aspect of law of the case doctrine." Id. Under this category of law of the case, lower court rulings become binding on higher courts through failure to preserve an issue for review. Id.
The Union's law of the case argument appears to fall within either the first or the fourth category outlined above. Regardless of its categorization, the court finds that the issues addressed by the Union are not law of the case. The method of calculating setoffs was not decided either expressly or implicitly in the earlier proceedings before this court, was not determined in the appeal, and has not been waived.
The issue of the appropriate period over which to calculate setoffs was not specifically decided in the earlier damage proceedings. The damage period originally found by this court was such a short period that it made no sense from an accounting standpoint to break it into two calendar years. The failure to account for setoffs on a yearly basis was not material.
The court must reject the Union's setoff calculations. The Union's accountant Susan Mackie presented a confused setoff computation. Mackie aggregated setoffs and carried forward an "excess setoff" figure from the wage category into the pension category. Mackie then subtracted this "excess setoff" figure from her pension damage figure to achieve a net damage figure. Mackie then attempted to estimate gross pension damages and pension setoffs from the net pension damage figures prepared by the plaintiffs' actuary Johnston. Mackie then used these estimated figures to estimate "excess pension setoffs" which she then used as setoffs against wage damages. In the court's opinion, Mackie's testimony was misleading, her reasoning circular and her result flawed. *774 The plaintiff's accountant presented a more sound computational method. The court found his testimony to be more credible.
IT IS BY THE COURT THEREFORE ORDERED that damages shall be awarded to the plaintiffs and against the defendant Union consistent with the rulings contained in this memorandum and order. Counsel for plaintiffs shall prepare and submit an appropriate journal entry of judgment within thirty (30) days of the date of this order.
IT IS FURTHER ORDERED that defendant's Motion for Judgment as to Post September 1983 Wage Rate (Doc. 775) is hereby denied.
IT IS FURTHER ORDERED that defendant's Motion for Judgment as to Invalidity of Plaintiffs' Damages Model (Doc. 789) is hereby denied.
IT IS FURTHER ORDERED that plaintiffs' Motion to Admit Inadvertently Omitted Exhibits (Doc. 877) is hereby granted.
NOTES
[1] Prior to the closing of Rodeo, pork kill and cut accounted for approximately 30% to 35% of total employment, according to the deposition testimony of Morrell witness James Humphrey. After the reopening as ACPC, pork kill and cut accounted for a large majority of total employment. ACPC appears to have produced no processed meats from the time of reopening until approximately November 1983. From March 1983 through October 1983, there were no employees in the bacon and ham departments. Beginning in November 1983, employees are shown for those departments. See Joint Exh. 1. While ACPC may have concentrated on pork kill and cut, it did conduct some pork processing.
[2] The Union's counsel would blame plaintiffs' counsel and the court for purportedly preventing new depositions to be taken from members of Morrell officialdom for use in the rehearing mandated by the Tenth Circuit. However, the Union's contention before this court at the trial on damages and before the Tenth Circuit in its argument on appeal was that this court erred in denying it the presentation of evidence which it already had in its possession at the time of the court trial. The record on rehearing will reflect that this court was generous, over plaintiffs' objections, in allowing a plethora of evidence, much of which was pure hearsay in multiple layers, in the form of many documentary ruminations (press releases and intra-office communications) as to solutions for Morrell's financial problems through production and marketing changes.
[3] This is subject to the court's determination, see infra, that no damages shall be awarded during the period of the Sioux Falls strike, which began on September 1, 1985.